**LEVERTON et al. v. CURTIS PUB. CO.**
No. 10467.

United States Court of Appeals
Third Circuit.

Argued Nov. 13, 1951.

Filed Dec. 12, 1951.

Philip H. Strubing, Philadelphia, Pa.
(Evans, Bayard & Frick, Philadelphia, Pa.,
on the brief), for appellant.

Joseph S. Lord, 3d, Philadelphia, Pa.
(Richter, Lord & Farage, Philadelphia, Pa.,
on the brief), for appellee.

Before MARIS, GOODRICH and STA-
LEY, Circuit Judges.

GOODRICH, Circuit Judge.

This case involves the extent of the right
of privacy. Plaintiff had a judgment in
the District Court. The defendant chal-
lenges both her right to recover and the
amount awarded to her by the jury verdict.

The facts are simple and almost undis-
puted. The plaintiff in 1947, when she was
a child of ten, was involved in a street
accident in the city of Birmingham, Ala-
bama. A motor car nearly ran over her.

A newspaper photographer who happened to be on the spot took a photograph of the child being lifted to her feet by a woman bystander. The picture was dramatic and its effect was heightened by the fact that it was an action picture, not one posed for the camera.

The photograph appeared in a Birmingham newspaper the day following. Twenty months later it was used by the Curtis Publishing Company as an illustration for an article on traffic accidents, with emphasis on pedestrian carelessness, under the title, "They Ask To Be Killed" by David G. Wittels. The print was purchased by Curtis from a supplier of illustration material. Plaintiff claims that the publication of her picture this long after the accident in which she was involved, was a violation of her right of privacy.

### What Law Governs?

The suit was brought in the federal court on diversity of citizenship only. We take our law, therefore, from the courts of the State of Pennsylvania. This is the kind of case where, if all the questions which could be pointed up by analysis were to be answered, we should find ourselves in a forest from which it would be pretty hard to escape. Where was the right of privacy invaded, for instance: Alabama where the plaintiff lived, Pennsylvania where the Saturday Evening Post was published, or every state in the Union to which the Post goes? If so, is there a separate lawsuit for each invasion? Does recovery in one action for one invasion preclude suit in some other state for another invasion? Because Pennsylvania has the "single-publication" rule in defamation, is the same thing true for invasion of privacy? Questions similar to this the court was compelled to face in Hartmann v. Time, Inc., 3 Cir., 1948, 166 F.2d 127, 1 A.L.R.2d 370. Fortunately, for judicial

peace of mind, we do not have to face them here.

The reason we do not have to face them is because the authoritative material on the right of privacy has not developed so far that we are confronted, in the narrow problem this litigation involves, with a difference in law of the various states which would necessitate a choice, choosing one rule to be applied and rejecting another. The history of the development of this right is well-known to all students of Tort law. It began to be talked by name following the interesting article by Brandeis and Warren in 4 Harvard L.Rev. 193 (1890). It received full discussion in an opinion rejecting the view that there is a common law right of privacy, in Roberson v. Rochester Folding Box Company, 1902, 171 N.Y. 538, 64 N.E. 442, 59 L.R.A. 478. But the New York decision has become the minority view. Courts which have had occasion to pass upon the matter have pretty generally accepted the right of privacy as an established part of Tort law. The Restatement states its existence as established. Restatement, Torts, § 867. Likewise have the writers in the law reviews, for whom the subject has been a prolific source of essay material.[1]

But the outlines of the right and the privilege to invade it are still dimly marked. What we conclude in this case is our opinion of what a Pennsylvania court would do with the question. We must fashion our decision "from the materials at hand" without the benefit of an authoritative decision on the exact point involved in Pennsylvania or elsewhere.

### Scope of the Question in This Case.

It is well to delineate with as much exactness as we can the very thing which we have here to decide. The defendant admits the existence of the right of privacy both generally and particularly under the law of Pennsylvania and Alabama.[2]

1. Feinberg, Recent Developments in the Law of Privacy, 48 Col.L.Rev. 713 (1948); Nizer, The Right of Privacy, 39 Mich.L.Rev. 526 (1941); Green, The Right of Privacy, 27 Ill.L.Rev. 237 (1932); Kacedan, The Right of Privacy, 12 Boston U.L.Rev. 353 (1932); Fitzpatrick, The Unauthorized Publication of Photographs, 20 Geo.L.J. 134 (1932); Moreland, The Right of Privacy Today, 19 Ky.L.J. 101 (1929); Buxton, The Right of Privacy, 35 Law Notes 25 (1931).

2. Alabama: See Smith v. Doss, 1948, 251 Ala. 250, 37 So.2d 118. The Penn-

■ The plaintiff, on the other hand, admits that the original publication in the Birmingham newspaper on the day following her accident, was not an actionable invasion of her right of privacy. This admission is well taken for, as pointed out in the Restatement, one who is the subject of a striking catastrophe is the object of legitimate public interest. This has nothing to do with waiver or consent, obviously. The result is the same as where one does waive his right of privacy by voluntarily getting into the public eye but the reason is different.

With the concession by the defendant that there is such a thing as a legally recognized right of privacy and with a concession by the plaintiff that there was no actionable invasion of that right by printing the picture of her traffic accident in the Birmingham newspaper on the day following the accident, the scope of what we must decide in this case is very materially narrowed.

### The Merits of the Case.

■ The general criterion for liability, as stated in the Restatement, is that "liability exists only if the defendant's conduct was such that he should have realized that it would be offensive to persons of ordinary sensibilities." This is just the criterion which the trial judge submitted in leaving this case to the jury. If the question is a jury question it has been answered by the verdict for the plaintiff. We find no help in any of the reported cases or views expressed by the essay writers in answering the question whether this answer is one for the fact-finding body to make. Reference of the question to the trier of the fact fits in with our general method of testing similar questions. Of course, the clear cases, either for or against liability, will remain under the control of the Court.

We do not think that the question, however answered, is determinative of this case. It is agreed on all sides that the original publication of the picture of this traffic accident was not actionable. If it invaded the right of the plaintiff to stay out of public attention, it was a privileged invasion, her interest in being left alone being overbalanced by the general public interest in being kept informed. As we see the questions in this case, they are two. (1) Is the privilege involved in the original publication lost by the lapse of time between the date of the original publication immediately following the accident and the reappearance of the plaintiff's picture in the Saturday Evening Post twenty months later? (2) The second question is whether, if the privilege has not been lost by lapse of time, it is lost by the using of the plaintiff's picture, not in connection with a news story, but as an illustration heading an article on pedestrian traffic accidents?

On the first point the plaintiff urges language from the comment of the Restatement of Torts, § 867. That comment, after dealing with writers, candidates for public office, and so on, mentions "One who unwillingly comes into the public eye because of his own fault, as in the case of a criminal, * * *." Then it goes on to say: "Community custom achieves the same result with reference to one unjustly charged with crime or the subject of a striking catastrophe. Both groups of persons are the objects of legitimate public interest during a period of time after their conduct

sylvania attitude is well analyzed by Feinberg, The Law of Privacy, 48 Col.L. Rev. 713, 714 (1948), "Misapplication of the privacy doctrine has occurred in Pennsylvania as well, in a lengthy Supreme Court concurring opinion which characterized a 'name band's' interest in preventing unauthorized broadcasts of its recordings as a right of privacy (Waring v. W.D.A.S. Broadcasting Station, 327 Pa. 433 [194 A. 631]). However, although two later cases in the Common Pleas Court of Philadelphia County cite the opinion as authority, they are safer on their facts (Clayman v. Bernstein, 38 Pa. D[ist.] & C. 543 and Harlow v. Bruno Co., 36 Pa. D[ist.] & C. 101). The more recent decision, Clayman v. Bernstein, upheld the right of a patient and her husband to have pictures destroyed which showed the effects of her illness and which the defendant physician had taken without her permission . . . the case leaves little doubt about the existence of a right of privacy in Philadelphia County."

or misfortune has brought them to the public attention; until they have reverted to the lawful and unexciting life led by the great bulk of the community, they are subject to the privileges which publishers have to satisfy the curiousity of the public as to their leaders, heroes, villians and victims."

It could be easily agreed that the plaintiff in this case, because she was once involved in an automobile accident does not continue throughout her life to have her goings and comings made the subject of newspaper stories. That, however, is a long way from saying that the occasion of her once becoming a subject of public interest cannot be brought again to public attention later on. Suppose the same newspaper which printed the plaintiff's photograph the day after her accident printed a resume sometime later of traffic accidents and supplied pictures dealing with them, including this one, which photographers on its staff had compiled. We cannot think that their publication under those circumstances would subject the publisher to liability.

The closest decision we have on this point is the Second Circuit case of Sidis v. F–R Publishing Corporation, 1940, 113 F.2d 806, 138 A.L.R. 15. This had to do with the liability of the publishers of the New Yorker for a sketch which appeared in that magazine about a man named William James Sidis. Mr. Sidis had been a mathematical prodigy when young and was, therefore, said to be the subject of interest by the general as well as the mathematical public. The New Yorker article in question came along nearly thirty years afterward and described the life of Mr. Sidis subsequent to his childhood prodigy days. The court, reviewing carefully the authorities, came to the conclusion that the article was not actionable. The case is an authority for us, not binding of course. But it was an effort by a very distinguished court to fashion a common law decision out of materials it found at hand concerning right of privacy cases just as we are trying to do.[3]

■ We conclude that the immunity from liability for the original publication was not lost through lapse of time when the same picture was again published.

Now to the second point. The first publication of the plaintiff's photograph was purely news. The second publication was a sort of a dramatic setting for the discussion of a traffic problem by Mr. Wittels. Does that much of a change in the purpose of the publication lose the privilege?

■ Something was made at the argument of the point that the use of the photograph by Curtis was "commercial". Of course it was. So was the original publication in the Birmingham newspaper. People who run newspapers and magazines as commercial enterprises, run them to make profit if they can. What adds to reader interest adds to circulation and that adds to profit. This point was met directly by Judge Clark in the Sidis case already referred to. The publication in this case was not an appropriation for a commercial use.[4]

■ Nevertheless, we think this particular publication was an actionable invasion of plaintiff's right of privacy. Granted that she was "newsworthy" with regard to her traffic accident. Assume, also, that she continued to be newsworthy with regard to that particular accident for an indefinite time afterward. This use of her picture had nothing at all to do with her accident. It related to the general subject

3. It is true that some of the discussion by that court dealt with the New York statute as plaintiff in this case points out. That discussion may be found on page 810 of the Report and is carefully separated from the common law discussion by the Court. Note, too, that at the very start of the opinion Judge Clark points out that the plaintiff was claiming violation of a right of privacy as that right was recognized in "California, Georgia, Kansas, Kentucky and Missouri." See also Prosser on Torts, p. 1059 (3d ed. 1941) stating that the New York courts seem to have arrived at much the same distinctions that other courts have reached at common law.

4. See Feinberg, Recent Developments in the Law of Privacy, 48 Col.L.Rev. 713, 720 (1948). See also Lahiri v. Daily Mirror, Inc., 1937, 162 Misc. 776, 295 N.Y.S. 382.

of traffic accidents and pedestrian carelessness. Yet the facts, so far as we know them in this case, show that the little girl, herself, was at the time of her accident not careless and the motorist was. The picture is used in connection with several headings tending to say that this plaintiff narrowly escaped death because she was careless of her own safety. That is not libelous; a count for defamation was dropped out in the course of the trial. But we are not talking now about liability for defamation. We are talking about the privilege to invade her interest in being left alone.

The heading of the article was called "They Ask To Be Killed". Underneath the picture of the little girl was the heading "Safety education in schools has reduced child accidents measurably, but unpredictable darting through traffic still takes a sobering toll." In a box beside the title appears the following: "Do you invite massacre by your own carelessness? Here's how thousands have committed suicide by scorning laws that were passed to keep them alive." The sum total of all this is that this particular plaintiff, the legitimate subject for publicity for one particular accident, now becomes a pictorial, frightful example of pedestrian carelessness. This, we think, exceeds the bounds of privilege.

An analogous case, though admittedly not right in point, is Mau v. Rio Grande Oil, Inc., D.C.N.D.Cal.1939, 28 F.Supp. 845. There a man who was a holdup victim had his unhappy experience translated into a radio program with garnishment and embellishment appropriate for that form of entertainment. The news account of the holdup was, of course, comparable to a news account of a traffic accident. But when his account came to be the basis for public entertainment, the Court considered the bounds of privilege exceeded. We think the same is true here.

■ Defendant complains of the amount of the judgment. It was for $5,000. We agree that the jury was pretty liberal with the defendant's money. But we have often expressed the limitation of our authority in controlling the amount of verdicts unless they are so high as to shock the judicial conscience. The trial judge heard the case and also heard and passed upon a motion raising the point of the alleged excessiveness of the recovery. We do not think that this case is strong enough to call upon us to substitute our judgment for either his or that of the jury.

The judgment of the District Court will be affirmed.