515 P.2d 659

La Verne BITSIE, by her father and next friend, Oscar Bitsie, Plaintiffs-Appellants,

v.

James B. WALSTON, the United Cerebral Palsy Association and Journal Publishing Company, Defendants-Appellees.

No. 1108.

Court of Appeals of New Mexico.
July 25, 1973.

Certiorari Denied Sept. 7, 1973.

**656**

Lorenzo A. Chavez, Melvin L. Robins, Leof Strand, Albuquerque, for plaintiffs-appellants.

William S. Dixon, Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, for defendant-appellee James B. Walston.

Turner W. Branch, Branch, Dickson, Dubois & Wilson, Albuquerque, for defendant-appellee The United Cerebral Palsy Assn.

J. J. Monroe, Johnson, Paulantis, Lanphere & Monroe, Albuquerque, for defendant-appellee Journal Publishing Co.

## OPINION

WOOD, Chief Judge.

The trial court directed a verdict for defendants on plaintiffs' claim for invasion of privacy. Prior to trial, summary judgment had been granted to defendants on plaintiffs' claim for libel. This appeal challenges the correctness of both rulings.

At the State Fair in 1970, Walston took a photograph of La Verne Bitsie, a Navajo child, then approximately 18 months old. The photograph was taken with the consent of her father, Oscar Bitsie. Walston prepared a sketch of La Verne and sent it to the father in February, 1971.

"The Arts" section of the Albuquerque Journal on Sunday, June 27, 1971, carried the headline: "Cards by Local Artists to Benefit Cerebral Palsy Fund." The article states: "Note cards designed by five local artists are being sold by the Women's Committee of United Cerebral Palsy to help finance a pre-school for children afflicted with cerebral palsy." The remainder of the article identifies six designs, states the price of the cards and where the cards could be purchased. One of the identified designs is: " * * * 'La Verne Bitsie, Navajo Girl' by Jim Walston, printed on tan paper. * * *"

Six photographs appear below the article. The photographs are of the designs identified in the article. One photograph is of the sketch of La Verne prepared by Walston.

Plaintiffs' suit for invasion of privacy and libel is based on the newspaper article and photograph.

*Invasion of privacy.*

New Mexico recognizes invasion of privacy as a tort for which damages may be recovered. Apodaca v. Miller, 79 N.M. 160, 441 P.2d 200 (1968); Blount v. T. D. Publishing Corporation, 77 N.M. 384, 423 P.2d 421 (1966); Hubbard v. Journal Publishing Company, 69 N.M. 473, 368 P.2d 147 (1962). The factual aspects of this tort have not as yet been delineated in New Mexico decisions. Compare Montgomery Ward v. Larragoite, 81 N.M. 383, 467 P.2d 399, 42 A.L.R.3d 859 (1970).

" * * * The plaintiff contends that the defendants appropriated her name and likeness without her consent and placed her in a false light in the public eye. * * *" Prosser, Law of Torts (4th Ed. 1971), indicates both items alleged—the appropriation and the placing in a false light—are two of the ways by which the tort may be committed. Prosser, supra, at 804 and 812. We proceed on the assumption that each of the claims allege the tort of invasion of privacy in New Mexico.

The three defendants present various contentions as to why they are not liable for an invasion of privacy in this case. We consider the contention common to each of the defendants. That contention is concerned with conduct for which liability is imposed and how that conduct is measured.

IV, Restatement of Torts § 867 (1939) states: "A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other." Comment (d) to § 867 discusses conditions of liability. It states: " * * * liability exists only if the defendant's conduct was such that he should have realized that it would be offensive to persons of ordinary sensibilities. * * *"

Comment (d), supra, goes on to say: " * * * It is only where the intrusion has gone beyond the limits of decency that liability accrues. * * *" It also states: "* * * It is only when the defendant should know that the plaintiff would be justified in feeling seriously hurt by the conduct that a cause of action exists. * * *"

In some of the following cases, the courts have referred to "limits of decency." In others, the reference is to "justified in feeling seriously hurt." All, however, have applied the view that for liability, defendants' conduct must have been such "that he [they] should have realized that it would be offensive to persons of ordinary sensibilities." Varnish v. Best Medium Publishing Co., 405 F.2d 608 (2d Cir. 1968), cert. denied, 394 U.S. 987, 89 S.Ct. 1465, 22 L.Ed.2d 762 (1969); Leverton v. Curtis Pub. Co., 192 F.2d 974 (3rd Cir. 1951); Samuel v. Curtis Pub. Co., 122 F. Supp. 327 (N.D.Cal., S.D.1954); Reed v. Real Detective Pub. Co., 63 Ariz. 294, 162

P.2d 133 (1945); Gill v. Curtis Pub. Co., 38 Cal.2d 273, 239 P.2d 630 (1952); Cason v. Baskin, 155 Fla. 198, 20 So.2d 243, 168 A.L.R. 430 (1944); Davis v. General Finance & Thrift Corporation, 80 Ga.App. 708, 57 S.E.2d 225 (1950); Meetze v. Associated Press, 230 S.C. 330, 95 S.E.2d 606 (1956). The converse of this rule is stated in Blount v. T D Publishing Corporation, supra: " * * * The right of privacy is to be applied to the individual of ordinary sensibilities, not the super-sensitive. * * *"

 Plaintiffs recognize the above rule is applicable in this case; we agree. The trial court applied this standard when it directed the verdict at the close of plaintiffs' case. Ordinarily, the question of whether defendants violated this rule is a jury question. See Varnish v. Best Medium Publishing Co., supra; Aquino v. Bulletin Company, 190 Pa.Super. 528, 154 A.2d 422 (1959). The trial court, by directing a verdict, determined the evidence was insufficient to support a verdict in plaintiffs' favor. See Brown v. Hall, 80 N.M. 556, 458 P.2d 808 (Ct.App.1969). In reviewing the correctness of this ruling, we consider the evidence in the light most favorable to plaintiffs, who were resisting the motion for a directed verdict. Archuleta v. Johnston, 83 N.M. 380, 492 P.2d 997 (Ct.App. 1971).

The father testified the newspaper story was offensive because La Verne's picture had been used with an article referring to cerebral palsy and at a time when she was in good health. According to the father, this means La Verne will have bad luck later in life. La Verne's grandmother testified that a "strong assumption" from the newspaper story is that La Verne had cerebral palsy. The grandmother also testified the use of La Verne's picture in relation · to the article "wished her harm." Benjamin Begay testified that this wish will become a reality. All of the foregoing testimony is on the basis of "traditional" Navajo belief.

 The evidence then is that the newspaper story was offensive to traditional Navajos. There is evidence that there are some 20,000 traditional Navajos in New Mexico. The right of privacy " * * * is a personal one, which does not extend to members of his family. * * *" Prosser, supra, at 814. Assuming, but not deciding, that the offense to traditional Navajos, including La Verne's father and grandmother, is evidence of an offense to La Verne (2½ to 3 years old at the time of the newspaper publication), the · evidence is insufficient for imposition of liability upon defendants. A traditional belief is one based on an inherited or established way of thinking; a cultural feature preserved from the past. Webster's Third New International Dictionary (1966). We cannot, as a matter of law, equate an offense to persons holding such a belief with an offense to persons of ordinary sensibilities.

 The interest which one has to maintain his privacy is the basis of the tort for invasion of privacy. Restatement of Torts, § 867, supra, Comment (a). " * * * This interest appears only in a comparatively highly developed state of society. * * *" Restatement of Torts, § 867, supra, Comment (b). The protection afforded to this interest " * * * is relative to the customs of the time and place and to the habits and occupation of the plaintiff. One who is not a recluse must expect the ordinary incidents of community life of which he is a part. * * *" Restatement of Torts, § 867, supra, Comment (c). We cannot equate an offense to persons holding a traditional belief with an offense to persons of ordinary sensibilities because: (1) the tort relates to the customs of New Mexico at this time and does not extend to "traditional" beliefs. (2) At this · time the newspaper story is no more than an ordinary incident of the life of the New Mexico community, which is the developed society on which the interest in privacy is based.

Our ruling, of no invasion of privacy as a matter of law, applies because there is no evidence that, as a matter of fact, the newspaper story offended persons of ordinary sensibilities.

Another aspect of the tort here involved is whether the defendants should have realized that the newspaper story would be offensive. Unless there is evidence that the defendants should have so realized, there is no basis for liability. Restatement of Torts, § 867, supra, Comment (d). Neither in brief nor argument did plaintiffs contend there was any evidence as to this requirement concerning Walston and The United Cerebral Palsy Association. We have reviewed the record; there is no such evidence as to these two defendants.

■ Plaintiffs assert there is evidence that the Journal should have known its story would have been offensive. This evidence is that the Journal, over a six or seven year period, had published "dozens of articles" on Navajo customs and beliefs. There is no evidence that the traditional belief asserted in this case was involved in the previously published articles. There is no evidence as to what customs and beliefs were covered in those articles. The evidence as to previously published articles does not sustain an inference that the Journal should have known the newspaper story in this case would be offensive.

*Libel.*

The claim of libel in the complaint is that the article, together with the picture identifying La Verne by name, " * * * inferred that plaintiff was afflicted with cerebral palsy, a serious disabling disease." Also, that " * * * circulation of the publication implying that plaintiff was a victim of cerebral palsy, was false and defamatory. * * *"

■ A defamatory meaning will not be given to words unless such a meaning is their plain and obvious import. Language will receive an innocent interpretation where fairly susceptible to such an interpretation. Reed v. Melnick, 81 N.M. 608,

471 P.2d 178 (1970); Perea v. First State Bank, 84 N.M. 326, 503 P.2d 150 (Ct.App. 1972). The newspaper story in this case does not plainly and obviously impute that La Verne had cerebral palsy. The story is not a libel per se.

■ Where the defamatory character of the writing can only be shown by reference to extrinsic facts, the plaintiffs must plead and prove either: (1) the publisher knew or should have known of the extrinsic facts which were necessary to make the statement defamatory in its innuendo or (2) special damages. Reed v. Melnick, supra.

In this case, neither extrinsic facts nor special damages were pled. Summary judgment on the libel claim was correct. Wilson v. Albuquerque Board of Realtors, 82 N.M. 717, 487 P.2d 145 (Ct.App.1971); compare Salazar v. Bjork, 85 N.M. 94, 509 P.2d 569 (Ct.App.1973).

The summary judgment and the judgment of dismissal entered pursuant to the directed verdict are affirmed.

It is so ordered.

HENDLEY, J., concurs.

SUTIN, J., dissents.

SUTIN, Judge (dissenting).

I dissent.

Sometimes, in sensitive cases, trial judges grant directed verdicts and summary judgments as fact finders. Sometimes, appellate judges affirm. It is difficult to explain this problem to Indian people, and the public generally, because they are not familiar with the variant legal attitudes with which judges are endowed. An analytical study proves that legal attitudes are as variant as the changes in seasons.

In this case, the majority determined what "ordinary sensibilities" are as a matter of law; that "We cannot, as a matter of law, equate an offense to persons holding [traditional Navajo beliefs] with an offense to persons of ordinary sensibilities"; that the evidence does not sustain an "in-

ference"; that the facts established, and inferences to be drawn therefrom, may be closeted.

Trial judges and courts of review should not be frightened to allow a jury to play its role—to determine issues of fact. Article II, Section 12 of the New Mexico Constitution provides in part:

> The right of trial by jury as it has heretofore existed shall be secured to all and remain inviolate.

Let no inference be drawn that this dissent indicates a desire for victory for plaintiffs. Our primary duty is to determine whether the jury, rather than the trial court, should render a verdict.

*The directed verdict on right to privacy was erroneous.*

The facts most favorable to plaintiffs are:

In 1970, at the New Mexico State Fair, La Verne Bitsie, one and one-half years of age, was in the Indian Village on the fairgrounds. Walston, accompanied by his wife, told Oscar Bitsie, the father, his child was cute; that her name, La Verne, was the same as Mrs. Walston's first name, and asked for permission to take a photograph of the child, which permission was given. Walston did not tell the father what use would be made of the picture.

In February, 1971, Walston prepared a sketch of La Verne and mailed it to her father. Oscar has a B.A. degree in history, is working on a master's degree in guidance and counseling, and for seven years, he has been employed by the Gallup–McKinley County School Systems as attendance counselor.

On June 27, 1971, in the Sunday edition of the Albuquerque Journal, the Walston sketch appeared in the Fine Arts section with an article entitled, "Cards by Local Artists to Benefit Cerebral Palsy Fund." The sketch was identified as " 'La Verne Bitsie' by Jim Walston". The article reads in part:

> Note cards designed by five local artists are being sold by the Women's Committee of United Cerebral Palsy *to help finance a preschool for children afflicted with cerebral palsy.*
>
> DESIGNS included are . . . "La Verne Bitsie, Navajo Girl" by Jim Walston, printed on tan paper; . . .
>
> THE CARDS are available at the United Cerebral Palsy office at 4807 Menaul NE . . . .
>
> Later, the cards are to be offered at the United Cerebral Palsy booth at the State Fair. [Emphasis added]

This article was offensive to Oscar because it associated his child with cerebral palsy when he knew she was in full health. To him and to the Navajo Indians, the article meant that the child was going to have some kind of bad luck later on in life. La Verne did have two or three cases of pneumonia the winter of 1971.

There are more than 20,000 traditional Navajos in New Mexico. It is their belief that if a person's picture is used by the publisher in connection with a serious ailment, the person will actually suffer from the disease because the harm has been wished on the child.

However, there was additional testimony. One witness testified that whenever you see a polio or retarded person fund campaign with pictures of children, you see a child who is crippled in that disease or shown with a handicap. Therefore, in this case, she said, you could naturally assume that La Verne Bitsie was helping cerebral palsy because she had it.

The Albuquerque Journal circulated, statewide, 100,000 copies of the Sunday edition. More than 1,500 were circulated in Gallup. It knew of the presence of Navajo Indians in Albuquerque and Gallup. If any members of the staff believed there was something that would offend the sensibilities of the readers, it would be brought to the attention of the editor or managing editor for decision. But it had no policy with reference to publication of matters of religious or cultural content. It ran a series of articles discussing various Indian pueblos up and down the Rio Grande Val-

ley in which it described the clans within the pueblo, their religious beliefs and how it affected everyday life of these Indian people. During the previous six or seven years, it ran dozens of articles of a similar nature about the Navajo Indians, written by members of the staff who were specialists in Indian affairs. These were matters of great interest to the non-Indians as well as the Indians.

The Sunday Fine Arts section is used to increase circulation, and the charge for advertising is one of the factors based upon circulation.

The Journal did get written consent to publish pictures of children in a series of articles on retardation of children, children in the Carrie Tingley Hospital and the school at Los Lunas. It recognized that problems existed in connection with children with afflictions; that it was necessary to get expressed or implied consent to use those pictures. No such consent was obtained in the instant case.

Was there an issue of fact whether an invasion of privacy occurred through the unauthorized use of the La Verne sketch in the Albuquerque Journal? I believe there was.

The right to privacy is the right of an individual to be let alone and to live a life of privacy and seclusion free from unwarranted publicity. This doctrine has its limitations because society has its rights. These limitations are (1) publication of public records. Hubbard v. Journal Publishing Company, 69 N.M. 473, 368 P.2d 147 (1962); (2) publication of matters of legitimate or public interest; or (3) where a person has sought and achieved prominence. Blount v. T D Publishing Corporation, 77 N.M. 384, 423 P.2d 421 (1966).

The right of privacy must be accommodated to freedom of speech and of the press and the right of the general public to the dissemination of information. The standard by which the right is measured is based upon a concept of the man of reasonable sensibility. Whether the publication by defendants is offensive to a reasonable person is a question for the jury to decide. Harms v. Miami Daily News, Inc., 127 So.2d 715 (Fla.App.1961); Reardon v. News-Journal Company, 3 Storey (Del.), 29, 164 A.2d 263 (1960); Bremmer v. Journal-Tribune Publishing Company, 247 Iowa 817, 76 N.W.2d 762 (1956); Aquino v. Bulletin Company, 190 Pa.Super. 528, 154 A.2d 422 (1959); Varnish v. Best Medium Publishing Company, 405 F.2d 608 (2nd Cir. 1968), cert denied 394 U.S. 987, 89 S.Ct. 1465, 22 L.Ed.2d 762 (1969); Leverton v. Curtis Pub. Co., 192 F.2d 974 (3rd Cir. 1951).

*Blount,* supra, recognized the constitutional protection of freedom of the press, but it pointed out that under Art. II, § 17, N.M.Const., that freedom is limited because it specifically provides that every person is "responsible for the abuse of that right."

It is obvious that neither La Verne Bitsie nor her sketch fell within the limitations set forth above. La Verne did not participate in a public event which invited special attention. She was not an item of news. The public interest could not require the use of La Verne's sketch without consent. The article on cerebral palsy, to fulfill its purpose and satisfy the public interest in the fund drive would succeed without the sketch because there was no relationship between La Verne and the cerebral palsy fund drive. The Journal invaded the right of La Verne to stay out of public attention, the right to be let alone. It was not overbalanced by general public interest in being kept informed of a healthy young Indian girl being related to cerebral palsy. Gill v. Curtis Pub. Co., 38 Cal.2d 273, 239 P.2d 630 (1952).

In Gruschus v. Curtis Publishing Company, 342 F.2d 775, 776 (10th Cir. (N.M.) 1965), the court said:

The intangible but protected right of privacy recognizes, with some limitations, a right to seclusion, to freedom from public disclosure of personal matters of pri-

vate life and other damaging and un-newsworthy publicity of a personal nature, and to recover for the appropriation of name or picture.

In a dissenting opinion, it is of little value to discuss the history and development of the law on "right to privacy." Reference must be made to legal periodicals because of their influence on courts. Prosser, Law of Torts (4th Ed. 1971) at 802; IV, Restatement of Torts § 867; 37 A Words & Phrases, Right of Privacy, Supplement; Civil Rights Law—Invasion of Privacy—Use of Photograph, 35 Albany L.Rev. 790 (1971); Brunetti, Invasion of Property—Recovery for Non-consentual Use of Photographs in Motion Pictures Based on the Appropriation of Property, Vol. II, No. 3, Duquesne L.Rev. 358 (1973); Miller, Commercial Appropriation Of An Individual's Name, Photograph or Likeness: A New Remedy For Californians, 3 Pacific L.J. 651 (1972); Lusky, Invasion of Privacy: A Clarification of Concepts, 72 Colum.L.Rev. 693 (1972); 77 C.J. S. Right of Privacy § 4; 62 Am.Jur.2d Privacy, § 28; Annot. 30 A.L.R.3d 203, at 246 (1970).

During the trial of the case, the court ruled: (1) That the law does not deprive a child of recovery for wrongs done merely because it is too young to appreciate the invasion of its privacy. (2) Whether the sensibilities of the ordinary person were offended, was a question for the jury not a matter of law for the court. (3) The jury was advised that it would be instructed as to the appropriate law to follow, " * * * after we have heard all the evidence * * *."

Shortly thereafter, plaintiff rested. Extensive arguments were made. The trial court "with some misgivings" directed a verdict because (1) The damages suffered by plaintiff were speculative for the present and future. (2) The reluctance of Navajo witnesses to discuss the cultural or traditional aspect of Navajo life made it impossible for the general public or the newspaper to avoid encroachment upon these cultural traditions and customs. (3) The nature of the publication itself was such that without drawing inferences and innuendos there could be no proof "or evidence of anything specifically that would be damaging except through the application of this event to the culture or the customs of the Navajos."

The majority opinion says: "The trial court applied this [right to privacy] standard when it directed the verdict at the close of plaintiffs' case." I find it difficult to read this conclusion from the language used by the trial court.

During the trial, able defense counsel had argued that the "right to privacy" test was "an objective test, just like the reasonable man test, in all of your negligence cases"; that the Journal and its editor acted in good faith, "and it's not offensive to another person of ordinary sensibility. It's not offensive to the people sitting in this jury, which represents, the ordinary, reasonable, prudent person."

THE COURT: Would that not then create a jury question, for the jury to determine, as to whether or not it offended the sensibilities of the ordinary person, as opposed to the Court ruling as a matter of law as to that point?

\* \* \* \* \* \*

Gentlemen, aren't you asking the Court to take from the jury the determination of whether this would invade the sensibility of the ordinary person? Because, if in fact I follow your suggestion, in every case, every time any testimony was proffered, the objection would be made that this is not within the scope of the ordinary man test, and the Court would exclude it, and the jury would never—would never be called upon to pass upon what the ordinary citizen would or would not believe.

\* \* \* \* \* \*

I think what you are saying is not that we have injected a false issue, but we

have injected only one issue, perhaps the merit of issues with regard to the ordinary sensibilities test. I'm going to overrule the objection * * *.

I agree with the trial court on the above issue. I disagree with the trial court on the issue of damages. Speculative damages was the basis of the directed verdict.

"It is not necessary that special damages should have occurred from the violation of the right of privacy in order to entitle the aggrieved person to recover." 77 C.J.S. Right of Privacy § 7a; Reed v. Real Detective Pub. Co., 63 Ariz. 294, 162 P.2d 133 (1945). See, Montgomery Ward v. Larragoite, 81 N.M. 383, 467 P.2d 399 (1970); IV, Restatement of Torts, § 867(d) (1939).

The majority opinion further states:

All of the foregoing testimony is on the basis of "traditional" Navajo belief.

The evidence then is that the newspaper story was offensive to traditional Navajos.

* * * * * *

We cannot, as a matter of law, equate an offense to persons holding [traditional Navajo beliefs] with an offense to persons of ordinary sensibilities.

There was testimony in addition to that which related to "traditional" Navajo belief. It was sufficient to create an issue of fact on the issue of "ordinary sensibilities." Otherwise, we hold plaintiff must prove by witnesses who claim they have "ordinary sensibilities", that they were "offended" by the Journal article with La Verne's picture.

"Ordinary sensibilities" like "ordinary care" is a relative term; it depends upon the circumstances. Employers Casualty Company v. Moyston, 80 N.M. 796, 461 P. 2d 929 (Ct.App.1969). The jury is composed of people who determine from the circumstances of this case whether the Journal article offended "ordinary sensibilities." "We cannot say as a matter of law that the [Journal] article would not be of-

fensive to a person of ordinary sensibilities." Varnish v. Best Medium Publishing Co., supra.

It is erroneous to say that traditional Navajo Indians are not people with "ordinary sensibilities." The same could then be said of Irish-Americans, Mexican-Americans, Chinese-Americans, black people, Catholics, Protestants and Jews. On Irish-Americans, see Murray v. New York Mag. Co., 27 N.Y.2d 406, 318 N.Y.S.2d 474, 267 N.E.2d 256 (1971). Here, under the statutory New York rule, a picture illustrating an article on a matter of public interest is considered used for the purpose of trade or advertising where the picture has no real relationship to the article. It is obvious that the picture of La Verne Bitsie had no real relationship to the cerebral palsy fund drive.

The trial court erred in directing a verdict on the right to privacy.

### The trial court erred in granting summary judgment on libel.

Unfortunately, we never know the basis for summary judgment in the absence of findings or reasons therefor. Both parties "must know upon what grounds the judgment was granted in order to properly present the controversial issue to the appellate court." Wilson v. Albuquerque Board of Realtors, 81 N.M. 657, 472 P.2d 371 (1970). The summary judgment stated no reasons therefor nor made any findings.

The majority opinion relies on two allegations of plaintiffs' complaint and then concludes that the newspaper story does not impute that La Verne had cerebral palsy; that the story is not a libel per se; that extrinsic facts were not pled, therefore, no claim for relief existed for libel.

It is wrong for this court to rule as a matter of law that the newspaper story does not impute cerebral palsy to La Verne. To impute "suggests ascribing something that brings discredit by way of accusation or blame." It is a question of

fact. I am not convinced beyond a reasonable doubt that the matters relied on by defendants in support of their motion for summary judgment were sufficient to support their burden. Goodman v. Brock, 83 N.M. 789, 498 P.2d 676 (1972).

It is wrong for this court to dismiss plaintiffs' complaint for failure to state a claim for relief. This denies the plaintiffs the right to amend the complaint, if necessary, to state a claim for relief. The trial court did not dismiss plaintiffs' complaint for failure to state extrinsic facts. It granted summary judgment. Upon what basis, we do not know.

Our procedural rule calls for a short and plain statement of the claim which gives the defendant fair notice thereof. Section 21–1–1(8)(a)(2), N.M.S.A.1953 (Repl.Vol. 4); United States v. Stull, 105 F.Supp. 568 (D.C.1952); Turner v. United States Gypsum Co., 11 F.R.D. 545 (D.C.1951). It should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Section 21–1–1(8)(a)(2), supra, should be read together with § 21–4–8, N.M.S.A. 1953 (Repl.Vol. 4) on libel and slander. This section provides it is not necessary to state in the complaint any extrinsic facts. It is sufficient to state generally that the defamatory matter was published concerning the plaintiffs. The only case which explained this section is Dillard v. Shattuck, 36 N.M. 202, 11 P.2d 543 (1932). This explanation is adverse, but it occurred prior to our procedural rule and is no longer effective on this point.

Reed v. Melnick, 81 N.M. 608, 471 P.2d 178 (1970) involved only dismissal of a libel complaint, not summary judgment. I find nothing in the record to support the summary judgment.