584 P.2d 1310

J. R. POTEET, Individually and as next friend of Renee Poteet, a minor, and Mrs. J. R. Poteet, Plaintiffs-Appellants,

v.

ROSWELL DAILY RECORD, INC., Defendant-Appellee.

No. 3241.

Court of Appeals of New Mexico.

Sept. 12, 1978.

David L. Norvell, Albuquerque, for plaintiffs-appellants.

T. T. Sanders, Jr., Sanders, Bruin & Baldock, Roswell, for defendant-appellee.

## OPINION

LOPEZ, Judge.

The plaintiffs appeal a summary judgment granted against them in a suit for invasion of privacy resulting from an article which appeared in the defendant's newspaper. We affirm.

The only issue on appeal is whether the trial court erred in granting the summary judgment.

The plaintiffs filed a complaint against the defendant newspaper alleging that on January 6, 1977, the defendant published a fourteen year-old's name, Renee Poteet, as having been the victim of an attempted sexual criminal act. The complaint alleged that Renee was not a public figure; that the publication was not newsworthy; and under the circumstances, the publication would be offensive to persons of ordinary sensibilities. The plaintiffs asked for special, general and punitive damages. The defendant filed a motion for summary judgment, and both parties filed affidavits. The court granted the defendant's motion for summary judgment, and plaintiffs appeal.

### Facts

Renee Poteet was kidnapped and criminally sexually assaulted on December 19, 1975. A complaint was filed with the magistrate on December 20th. The assistant district attorney stated in his affidavit that one of the reporters promised that Renee's name would not be published in the article appearing at the time of the incident. Irrespective of whether such a promise was made, no article releasing plaintiff's name was published prior to the preliminary hearing of January 6, 1977. After the preliminary hearing an article was published in the defendant's newspaper naming Renee Poteet as the victim of a sexual assault. Notes for the story had been taken by a reporter at the preliminary hearing.

The plaintiffs do not allege that the publication was erroneously reported. They only allege: (1) that the publication was not newsworthy and was, therefore, not privileged; and (2) even if it was privileged, the defendant had no right to publish it on the grounds of estoppel and waiver.

In a recent United States Supreme Court case, *Cox Broadcasting Corporation v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975), the Supreme Court said:

> [T]he prevailing law of invasion of privacy generally recognizes that the interests in privacy fade when the information involved already appears on the public record.

In the instant case the article was published following an open preliminary hearing in magistrate court. The New Mexico Supreme Court, quoting from Prosser on Torts, 2d Ed., 623–624, stated:

"Since it obviously is to the interest of the public that information be made available as to what takes place in public affairs, a qualified privilege is recognized under which a newspaper . . . may make such a report to the public. * *

"An important field for the privilege is the reporting of any judicial proceeding, no matter how inferior the tribunal . . . ." *Hubbard v. Journal Publishing Company*, 69 N.M. 473, 368 P.2d 147 (1962).

The incident was a matter of public record and was therefore newsworthy. The trial court correctly ruled that the article published in defendant's newspaper was privileged.

Plaintiffs argue that the newspaper had a general policy of refraining from using minors' names in sexual assault incidents and that this policy estopped defendant from publishing the plaintiff's name. The requirements of estoppel have been set out in *Tome Land & Improvement Co. v. Silva*, 83 N.M. 549, 494 P.2d 962 (1972). In *Tome Land*, the New Mexico Supreme Court stated:

It is the rule in New Mexico that estoppel by conduct arises when a party has been induced by the conduct of the other to do, or forbear from doing, something he would not have done but for such conduct. [citation omitted] . . . the party asserting the estoppel must rely, to its detriment, on the conduct of the party against whom the estoppel is being asserted.

Plaintiffs introduced no affidavits which would indicate that they relied on defendant's policy, or that they even had knowledge of the policy prior to the time Renee testified at the preliminary hearing. With-

out knowledge there can be no reliance. Estoppel was not applicable to this case as a matter of law.

Plaintiffs further argue that the newspaper waived its privilege by virtue of the reporter's representations to the district attorney that plaintiff's name would not be published.

Even assuming that the reporter made statements to the district attorney regarding non-publication of Renee's name, such statements do not raise an issue of material fact which would preclude summary judgment.

As the New Mexico Supreme Court stated in *Goodman v. Brock*, 83 N.M. 789, 498 P.2d 676 (1972):

Unquestionably the burden was on defendants to show an absence of a genuine issue of fact, or that they were entitled as a matter of law for some other reason to a summary judgment in their favor. [citations omitted] However, once defendants had made a prima facie showing that they were entitled to summary judgment, the burden was on plaintiff to show that there was a genuine factual issue and that defendants were not entitled as a matter of law to summary judgment. [citations omitted]

As the party moving for summary judgment, the defendant made a *prima facie* showing by raising the defense of privilege, thus making it immune from suit as a matter of law. At that point the burden shifted to plaintiffs to show why defendant was not immune. Plaintiffs sought to do so by claiming that defendant had waived its privilege. When plaintiffs raised this claim, they had to show that there was an issue of fact as to waiver. They attempted to do this by saying the reporter had promised plaintiff's name would not be published. This was insufficient to show waiver without raising the additional requirement of the reporter's authority to speak for the defendant. Plaintiffs made no showing that the reporter had any authority to make

the statements attributed to him. Absent authority, the statements of the reporter could not be considered as a waiver of a constitutional privilege by the defendant newspaper. See *Rekart v. Safeway Stores, Inc.*, 81 N.M. 491, 468 P.2d 892 (Ct.App. 1970).

Summary judgment was proper because defendant's publication of the information was privileged as a matter of law, and waiver and estoppel do not apply as a matter of law. In spite of the unfortunate incident which occurred, we have no alternative but to affirm the trial court's granting of summary judgment.

The summary judgment is affirmed.

IT IS SO ORDERED.

HERNANDEZ, J., concurs.

SUTIN, J., specially concurring.

SUTIN, Judge (specially concurring).

*I specially concur.*

Justice Jackson, dissenting in *Craig v. Harney*, 331 U.S. 367, 394, 67 S.Ct. 1249, 1263, 91 L.Ed. 1546 (1947), said:

> This is one of those cases in which the reasons we give for our decision are more important to the development of the law than the decision itself.

With this corollary in mind, the Supreme Court of New Mexico allowing publication of this opinion, I shall state the reasons why the present status of the doctrine of the right to privacy versus freedom of the press should be modified wherein the child victim of a crime is exposed by the press to public disclosure.

The Court of Appeals does not have the power to reverse decisions of the Supreme Court. It does have the power of suggestion that cases be overruled or exceptions made, even though its opinion is denied publication.

"It cannot be repeated too often that the freedom of the press so indispensable to our democratic society presupposes an independent judiciary which will, when occasion demands, protect that freedom." [331 U.S. at 384, 67 S.Ct. at 1258, Justice Frankfurter, dissenting.] The judiciary continues to protect the press even though the judiciary is criticized and condemned by the press. This criticism is essential to the continuum of an independent judiciary. Personal feelings must not thwart our duty to protect constitutional rights of the media. Nevertheless, because of the importance of the effect of freedom of the press on family life, we should seek a solution to this vexatious problem.

It is now established law in the United States and in the State of New Mexico, that the right to privacy fades when a newspaper article reflects accurate information obtained from public documents or from testimony given in a public hearing. *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975); *Hubbard v. Journal Publishing Company*, 69 N.M. 473, 368 P.2d 147 (1962); *Rockafellow v. New Mexico State Tribune Co.*, 74 N.M. 652, 397 P.2d 303 (1964). The purpose of this opinion is to suggest three ways in which the detriment caused a child victim can be protected under the doctrine of the right to privacy.

In passing, it is important to note why the name of the family and the child victim should be deleted from the caption and the opinion rendered in this appeal.

Because of a news article in the Roswell Daily Record, parents of a child, deeply concerned with disclosure of the name and address of a 14-year-old daughter, the victim of a 25-year-old "independent-fundamental minister" who feloniously kidnapped and assaulted her, moved from Roswell, New Mexico to the State of Texas. If this opinion, or one published by the Supreme Court, is placed in the New Mexico Reports and the Pacific Reporter, the family name, including that of the daughter, will become known to judges and lawyers throughout the land who research the doctrine of the

right of privacy, and in some respects to the public. By taking this appeal, the parents cause this odious event to be indelibly printed on the pages of public books, law review articles and comments. During the lifetime of the family and thereafter, this written discourse will be a matter of public record. To delete the family name would help the family.

If the Supreme Court allows television in the courtroom to screen proceedings in criminal trials and hearings involving child victims, and publicly show the movie, the effect on families and children will be devastating.

In the instant case, the Roswell Daily Record was not able to disclose the name of the child when it first had knowledge of this atrocious event and disseminated the news. The information was withheld by the assistant district attorney and the police. The conduct of the government was laudable. It protected the dignity of the family. A police report that shows the name and address of a rape victim is a public record not exempt from inspection by the public and the press. *Ayers v. Lee Enterprises Inc.*, 277 Or. 527, 561 P.2d 998 (1977). The Daily Record did not force the government to produce the information. The conduct of the press was laudable.

A few days later, the daughter appeared at a preliminary hearing in magistrate court and testified. A reporter for the newspaper was present who saw, heard, and reported the name and address of the child. It is common knowledge that the public who reads the event in the news article is shocked. To read the name and address of the child is distressing to the family and the child. The child victim, an ordinary young female, is not a celebrity, a public official or public figure.

The disclosure of the name and address of a young rape victim has no news value for public consumption. The name of a rape victim is not necessary to tell the story. It may be said with some degree of certainty that the American family scorns disclosure of this nature. Disclosure does not serve the public interest because the name of the child is not newsworthy. The public need not know the name to function in a democratic society. To deny the press the right of disclosure of the name did not impinge upon the right to freedom of the press.

This young female testified to assist the State and the public in the conviction of a criminal. Yet, because freedom of the press is declared to be essential to a healthy government in a free society, the courts grant the press the right to broadcast to the world with impunity the name and address of a child rape victim. Parents are unaware of this constitutional right. If notice to the parents were required, parents could exercise their discretion in submitting their children to the whimsey of the press. It would not harm the press or the public to require consent of parents to disclose the name of child victims. A New York written consent statute was held constitutional in *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). To hold that names of children may be publicized without parental consent with absolute immunity runs counter to their rights to " 'the pursuit of happiness' " as contemplated by those who founded this nation. *Deaton v. Delta Democrat Publishing Company*, 326 So.2d 471 (Miss.1976).

In *Cox Broadcasting Corp.*, Mr. Justice White said:

> [P]owerful arguments can be made, and have been made, that however it may be ultimately defined, there ·*is* a zone of privacy surrounding every individual, a zone within which the State may protect him from intrusion by the press, with all its attendant publicity. [Emphasis by Court.] [420 U.S. at 487, 95 S.Ct. at 1042, 43 L.Ed.2d at 345.]

Justice White relied on a scholarly book and law review articles. In closing his opinion, Justice White said:

> *If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid pub-*

lic documentation or other exposure of private information. *Their political institutions must weigh the interests in privacy with the interests of the public to know and of the press to publish.* [Emphasis added.] [420 U.S. at 496, 95 S.Ct. at 1047, 43 L.Ed.2d at 350.]

In *Time, Inc.*, Justice Fortas dissenting, said:

Privacy, then, is a basic right. The States may, by appropriate legislation and within proper bounds, enact laws to vindicate that right. [385 U.S. at 415, 87 S.Ct. at 556.]

The right of citizens to inspect public records is limited in three respects and "as otherwise provided by law." Section 71–5–1, N.M.S.A. 1953 (Repl. Vol. 10, pt. 2, 1975 Supp.). See, *Deaton, Ayers, supra*; *Winegard v. Larsen*, 260 N.W.2d 816 (Iowa 1977); *McLaughlin v. Philadelphia Newspapers, Inc.*, 465 Pa. 104, 348 A.2d 376 (1975).

Apart from the Legislature, a solution rests in the wisdom of the Supreme Court.

The right to privacy is a most fundamental human right older than the Bill of Rights in the United States Constitution. Privacy did not make its appearance as a cause of action in legal literature until 1890 when the Warren and Brandeis article on *The Right to Privacy* appeared in 4 Harv.L. Rev. 193. The cause of action first appeared in statute in 1903 and in judicial decision in 1905. *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 50 S.E. 68 (1905). This scholarly opinion has been followed in many states of the union in the development of the law. The court then said:

The stumbling block which many have encountered in the way of a recognition of the existence of a right of privacy has been that the recognition of such right would inevitably tend to curtail the liberty of speech and of the press. [50 S.E. at 73.]

The First Amendment to the Constitution of the United States reads in part:

Congress shall make no law . . . abridging the freedom of speech, or of the press . . . . .

Article II, § 17, New Mexico Constitution reads:

Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.

The Georgia Constitution has the same language.

Under the constitutional provisions, only the Congress and the Legislature are denied the power to intrude upon freedom of speech and the press. Yet, the Supreme Court of New Mexico has advised the public and the press that "If the Congress and the Legislature are prohibited from abridging the freedom there is no reason why the courts be given greater power." *Blount v. T D Publishing Corporation*, 77 N.M. 384, 388, 423 P.2d 421, 424 (1966). I disagree. In the adoption of the Constitution, the people did not restrict or restrain judicial power to be exercised by the Supreme Court. It is a separate, independent department of government whose powers are not subject to intrusion. Article III, § 1, New Mexico Constitution. The judicial department was not denied the power to intrude upon the freedom of speech and the press. Early in state history, the Supreme Court declared that *"The officers of each department*, except in certain instances, *are answerable only to the people."* [Emphasis added.] *Kelley v. Marron, State Treasurer*, 21 N.M. 239, 243, 153 P. 262, 263 (1915).

Whenever the Supreme Court wants to administer justice between the press and the child victim who testifies in court, it can step in and create rules of evidence, practice and procedure that protect the child and its right to privacy. The Legislature lacks this power. *Ammerman v. Hubbard Broadcasting, Inc.*, 89 N.M. 307, 551 P.2d 1354 (1976). In 1973, the Legislature enacted a law that protected journalists and newscasters from disclosure of news sources and information unless disclosure was essential to prevent injustice. In *Ammer-*

*man*, the Supreme Court held that this statute was governed by rules of evidence and procedure and declared it unconstitutional. In this area of the law, the power of the Supreme Court is absolute, not relative.

In recent years, this power has been exercised to meet the changes that have occurred in the social development of the State. See *State ex rel. Newsome v. Alarid*, 90 N.M. 790, 568 P.2d 1236 (1977) where a student newspaper reporter at the University of New Mexico who sought disclosure of all of the nonacademic staff personal records under the Right to Inspect Public Records Act, § 71–5–1, *supra*, was entitled to disclosure of such records only that were not confidential; *Pharmaseal Laboratories, Inc. v. Goffe*, 90 N.M. 753, 568 P.2d 589 (1977) where proof of medical malpractice was delineated; *Hicks v. State*, 88 N.M. 588, 544 P.2d 1153 (1975) where the defense of sovereign immunity was abolished; *Valley Utilities, Inc. v. O'Hare*, 89 N.M. 262, 550 P.2d 274 (1976) where as a matter of substantial public interest, absent members of the "spurious" class in a class action suit were not allowed to intervene after the jury had rendered its verdict; *McGeehan v. Bunch*, 88 N.M. 308, 540 P.2d 238 (1975) where the guest statute was held unconstitutional; *Alexander v. Delgado*, 84 N.M. 717, 507 P.2d 778 (1973) where the defense of unavoidable accident was abolished; *Williamson v. Smith*, 83 N.M. 336, 491 P.2d 1147 (1971) where assumption of risk was no longer held to be a defense; *State ex rel. Gomez v. Campbell*, 75 N.M. 86, 400 P.2d 956 (1965) where the Supreme Court exercised its absolute discretion to decide constitutional questions of public interest even though the party bringing the action had no standing to raise the issues.

Article VI, § 3, New Mexico Constitution grants the Supreme Court superintending control over all inferior courts. The Court of Appeals is an "inferior" court. Under this absolute power, the Supreme Court has often summarily denied publication of opinions of the Court of Appeals whether brought before the Supreme Court or not, even though a statute grants to the Court of Appeals the right to determine publication of opinions. Each judge of the Court of Appeals, though answerable to the people, does not have the right to "freely speak, write and publish his sentiments on all subjects."

Pursuant to its absolute power, the Supreme Court may adopt rules (1) that require the press to seek the consent of parents before the name of the child can be disclosed, and (2) a rule of evidence that the name of the child shall not be disclosed during any trial or hearing.

Under Rule 510(a) of the Rules of Evidence [§ 20–4–510(a) N.M.S.A. 1953 (Repl. Vol. 4, 1975 Supp.)], the Supreme Court granted government "a privilege to refuse to disclose the identity of a person who has furnished information relating to or assisting in an investigation of a possible violation of law to a law enforcement officer . . . conducting an investigation." See, *State v. Robinson*, 89 N.M. 199, 549 P.2d 277 (1976).

In 1972, the Legislature adopted the "Children's Code." Sections 13–14–1, et seq., N.M.S.A. 1953 (Repl. Vol. 3, pt. 1). Section 13–14–36 provides that "The name of the child shall not appear in the record on appeal." In 1976, the Supreme Court adopted "Children's Court Rules." Sections 13–14A–1, et seq., N.M.S.A. 1953 (Repl. Vol. 3, pt. 1, 1976 Supp.). Section 13–14A–23(b) provides that *the name of the child shall be stated in the petition filed.* By this rule, the Supreme Court made the name of the child a matter of public record open to the press, but on appeal, the Legislature declared that the name of the child shall not be disclosed to the press. The Supreme Court did not exercise its power to declare the name of the child to be disclosed on appeal. As long as the Supreme Court holds the power to protect the disclosure of a child's name, that protection does not exist until the power is exercised. The Supreme Court can adopt a rule of evidence

that denies the press the right to disclose the child's name.

The Supreme Court has the power to intrude upon the freedom of the press, radio and television, yet protect the right to privacy. If it does so, it has the power to make its opinion retroactive. Protection of child victims should be our primary concern. It should be an exception to the present applicable rule of law. This exception lies outside the umbrella of the pertinent constitutional provisions, *supra*.

All that is required to reverse this case is to weigh the interest of the press, the public, and the child victim in the disclosure of the name. How important was it to the freedom of the press, or the right of the public to know, that in a news article of an event, the name of the child be published? How serious was the injury to the female child victim who was harmed by a man, and whose suffering was opened to public view? Can anyone doubt that the press is likely to have rough sledding? A decision that nondisclosure of the name outweighs freedom of the press under our present law will require unusual judicial courage.

The protection of a family and a child victim, the essence of a democratic society, has greater significance than freedom of the press, that, in cases of this kind, thwart that protection. I feel reasonably safe in asserting that owners of media communications agree.

The press have adopted a code of ethics whereby the names of juvenile offenders are not identified to the public. *Brian W. v. Superior Court of Los Angeles Cty.*, 20 Cal.3d 618, 143 Cal.Rptr. 717, 574 P.2d 788 (1978). This is a moral, not a legal, concept that the press does not need to follow. *State v. Allen*, 73 N.J. 132, 373 A.2d 377 (1977).

*Blount* casts a shadow upon this doctrine. *Blount* says that "the right of privacy is generally inferior and subordinate to the dissemination of news. *Garner v. Triangle Publications*, 97 F.Supp. 546 (S.D.N.Y.

1951)." [77 N.M. at 389, 423 P.2d at 424.] *Garner* said:

> The common-law right of privacy cannot be infringed by items of current news which come under the category of dissemination of information. [97 F.Supp. at 549.]

Over a half century ago, Justice Brandeis, dissenting in *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) said:

> The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. . . . They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.

The right to privacy is not generally inferior to the dissemination of news. In becomes subordinate only when the right to privacy is overbalanced by the general public interest to know and to be kept informed. Whether the right of privacy is overbalanced is a risk the press assumes, a risk resolved by the trier of fact.

In the development of the law of freedom of the press and the right to privacy, we should view these matters in the light of late 20th century social progress. We must unswervingly believe that a free press lies at the heart of our democracy and its preservation is essential to the survival of liberty. But what is the lawful zone of this freedom? If it would fulfill its historic function in this nation, freedom of the press embraces all issues about which information is needed or appropriate to enable the people to cope with the demands of the time. "A broadly defined freedom of the press assures the maintenance of our political system and an open society." *Time, Inc.* [385 U.S. at 389, 87 S.Ct. at 543]. The nonpublication of the name of a child, a victim of an intended rape who testifies in court, cannot infringe upon the maintenance of our political system nor affect the continuance of an open society. To the contrary, it acts as a coaxial cable that runs toward the protec-

tion given a child under the doctrine of the right of privacy. The protection of a family and a child, the essence of a democratic society, has greater significance than the freedom of the press to thwart that protection.

Nevertheless, *Cox Broadcasting Corp.* holds the contrary. *Cox* involved the constitutionality of a Georgia statute that imposed sanctions on the accurate publication of the name of a rape victim obtained from court records maintained in connection with the public prosecution open to public inspection. The child was murdered. A general assignment reporter for WSB-TV of Atlanta was assigned to cover the proceedings. He learned the identity of the rape victim from indictments shown to him at his request by the county clerk of courts, who was present in the courtroom. The name of the victim was later televised that day and the next. The United States Supreme Court held that the freedom of expression guaranteed by the First Amendment precluded a state from imposing liability for publication of accurate information properly obtained from court records open to public inspection. The opinion was limited to inspection of "court records."

*Cox* is not held in high esteem. It "proceeds from dubious assumptions, and ultimately evades the important first amendment issue presented in that case." Hill, *Defamation and Privacy Under the First Amendment*, 76 Colum.L.Rev. 1205, 1207 (1976).

*Hubbard v. Journal Publishing Company, supra*, "is apparently the first reported case in the country brought against a communications medium for invasion of privacy by a female victim of a sexual attack." Franklin, *A Constitutional Problem in Privacy Protection: Legal Inhibitions on Reporting of Fact*, 16 Stan.L.Rev. 107, 108 (1963). "The appearance of the victim's name on a police blotter or in a court record of indictment in order to identify the incident with specificity would provide no basis for newspaper publicity." (Id. p. 121). The name of a female child rape victim is a simple fact, not news.

In *Hubbard*, the Journal published a verbatim copy of official records in the juvenile court. However, the statute relied upon that made records of juvenile delinquents public records and open to inspection [§ 13-8-66, N.M.S.A. 1953 (Repl. Vol. 3)] was repealed in 1972 by adoption of the "Children's Code." Laws 1972, ch. 97, § 71. What the decision of the court would have been absent the statute is an unknowable. Nonetheless, *Hubbard* has been extensively cited, even in *Cox Broadcasting Corp.*, and in my dissent in *Bitsie v. Walston*, 85 N.M. 655, 661, 515 P.2d 659 (Ct.App.1973), that the right to privacy fades with publication of court records.

Freedom of the press is relative, not absolute. The press is liable for defamation. *Ammerman v. Hubbard Broadcasting, Inc.*, 91 N.M. 250, 572 P.2d 1258 (Ct.App.1977). *Ammerman* distinguished defamation from wide-open criticism by the press. We commend wide-open criticism that finds fault with methods, policies and intentions of persons and public officials, including the writer of this opinion and other judges. But I do not commend the publication of unworthy news that names a young female rape victim, details the privacy of an ordinary person, sexual relations, gossip or any other unworthy news that intrudes upon the privacy of the domestic family and allows it to be exploded to every nook and corner of the land.

George Santyana once wrote that "The family is one of nature's masterpieces." Children are our most valuable natural resource. Freedom of the press should not mar nature's great contribution to a healthy democratic society.