572 P.2d 1258

M. A. AMMERMAN, Jerry Landavazo, James D. Webb and Jim Golden, Plaintiffs-Appellants,

v.

HUBBARD BROADCASTING, INC., Jerry Danziger, Richard McKee, Leo Zani, Diane Dimond, John Doe and Jane Doe, Defendants-Appellees.

No. 2818.

Court of Appeals of New Mexico.

Nov. 15, 1977.

Writ of Certiorari Denied Dec. 27, 1977.

Fred M. Calkins, Jr., Albuquerque, for appellant Ammerman.

Turner W. Branch, Branch & Coleman, P. A., Albuquerque, for appellant Landavazo.

Mary C. Walters, Albuquerque, for appellants Webb & Golden.

Leland S. Sedberry, Jr., and Judy A. Fry, Modrall Sperling, Roehl, Harris & Sisk, Albuquerque, for defendants-appellees.

OPINION

SUTIN, Judge.

Plaintiffs, as deputy sheriffs in Bernalillo County, separately sued defendants for defamation based upon broadcasts by Station KOB Radio on June 13, 1975 and June 24, 1975. These cases were consolidated for trial. Summary judgment was granted defendants, and plaintiffs appeal. We reverse.

A. *Prologue*

Hubbard Broadcasting, Inc. was the owner of Radio Station KOB. Its news director was Leo Zani. Its reporter was Diane Dimond.

*On June 13, 1975*, defendants Zani and Dimond aired two radio broadcasts on KOB

to bring to the public a special report on the controversy surrounding the Bernalillo County Sheriff's Department, specifically its leader, Sheriff Joe Wilson.

The broadcast consisted of quotations from transcribed taped interviews held with confidential informants. The following excerpts were directed to plaintiffs, Jerry Landavazo, James D. Webb, Jim Golden and M. A. Ammerman, all deputy sheriffs:

> There is another new man, his name is *Jerry Landavazo. I hear that he has served time in the penitentiary in Arizona.* [Emphasis added]

On misuse of taxpayers' funds in the form of County vehicles, the broadcast said:

> On Sunday afternoon *Jim Golden and Jim Webb* were at a race track in Santa Fe. . . . The car was a '75 white Plymouth. It was a County vehicle assigned to these boys to do investigation work with-only. *They were not on any assigned case.* . . .

> \* \* \* \* \* \*

> Now the matter of misuse of credit cards appeared. We asked our sources for specific instances. *They cited a trip to El Paso made by a Lieutenant to transport an illegal alien back to New Mexico to serve as Sheriff Wilson's personal housekeeper.* . . . *Lieutenant Mort Ammerman* rumored for a week that he was going on a special detail for the Sheriff to El Paso. . . . I personally saw the credit card transfer from Officer Don Marquez to Lieutenant Ammerman. Marquez had the card in his possession that morning and he gave it to Ammerman. . . .

> \* \* \* \* \* \*

> *We had also heard of another trip taken by this Sheriff to the El Paso area. It, presumably, was to be a second try at obtaining a certain illegal alien to be brought back to New Mexico to serve as a housekeeper for Sheriff Wilson. She was chosen, say our sources, because her fate was of personal interest to Lieutenant Ammerman.* [Emphasis added]

*On June 24, 1975,* Zani and Dimond aired a radio broadcast about a criminal case that involved Clara Mary Lucero. By an order of court, she was brought to the Bernalillo County jail on January 30, 1975 to confer with her attorney and then return to the State Penitentiary. Her furlough was extended for eight days. She did not stay in the Bernalillo County jail on February 1st, 2nd, 3rd, 4th or 5th. On January 30, 1975, at 11:15 p.m., she was checked out to a couple of Sheriff's deputies, Joe Collins and *Jim Webb,* in violation of the court's order. She was seen at Holiday Inn with Joe Collins and possibly *Jim Webb.* The eyewitness recognized Joe Collins. The broadcast continued:

> Recently, Deputy *Landavazo* filed suit against owners, managers and reporters of KOB and a (sic) sworn complaint, *Landavazo* claims the information given to KOB was erroneous. *Based solely on his sworn complaint KOB, its owners, manager and reporters wish to retract the previous statement and issue their apology to Deputy Jerry Landavazo.* [Emphasis added]

After some discovery procedures, defendants filed a motion for summary judgment because there was no evidence of malice and the broadcasts alleged were privileged. The trial court held a lengthy hearing and denied the motion because plaintiffs were not "public officials." At the same time, the trial court entered an order that the defendants produce and disclose the names of all confidential informants and produce additional information. It had determined that such disclosure was essential to prevent injustice to the plaintiffs for the following reasons:

> 1) That there is an issue as to the reliability of the confidential informants; that, unless Defendants be required to disclose the identity . . ., Plaintiffs shall be denied any opportunity to test the reliability and credibility of such informants and the existence, or lack of it, of Defendants' good faith, actual malice, and/or reckless disregard for the truth or falsity of the matters broadcast . . .

> . . . . .

3) That from the affidavits, depositions and statements produced at the hearing on the motion for disclosure *it appears that the Defendants have waived their right to confidentiality by inviting the following persons to have access to the information*: [five persons listed] [Emphasis added]

The testimony from the hearing on the motions and from the depositions indicate that these people have heard the tapes of the alleged confidential informants and been made aware of the alleged informants' identities, and/or have participated in interviews with the alleged confidential informants; that said persons are neither attorneys nor employees of KOB or Hubbard Broadcasting Company and stand in no position or privity or privilege with regard to such alleged confidential information or informants.

4) That the parties have raised, through testimony and affidavits, a question of the reliability of the alleged confidential information and the credibility of the alleged confidential informants and Defendants' alleged confirmation of such information; that the only reliable way to assertain [sic] the credibility of such informants and the truth of the information related by such informants herein, is to allow Plaintiffs to have access to the identity of, and the recorded statements made by, the informants, and to be allowed to cross-examine the informants on the truth of the assertions claimed to have been made by such informants.

Defendants appealed this order to the Supreme Court and the appeal was dismissed. The Court held unconstitutional § 20–1–12.1, N.M.S.A. 1953 (Repl. Vol. 4, 1975 Supp.) pertaining to the right of non-disclosure by journalists and newscasters. *Ammerman v. Hubbard Broadcasting, Inc.*, 89 N.M. 307, 551 P.2d 1354 (1976). The above Order of Disclosure remains in effect.

Thereafter, the trial court entered an order detailing the procedure to be followed in disclosing the identity of confidential informants, the transcription of certain tape records, and providing for *in camera* review. This order also remains in effect.

However, at a later date set for hearing on various motions, without notice or request by attorneys and to the surprise of all parties, the trial court presented and filed a document called "MEMORANDUM OPINION AND JUDGMENT OF DISMISSAL". The judgment of dismissal vacated and set aside the previous order that denied defendants' summary judgment, and granted defendants' motions for summary judgment. All plaintiffs' complaints were dismissed with prejudice. In its memorandum, the trial court stated in its own research it discovered the case of *Rosenbloom v. Metromedia*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), and this case was dispositive of the issues because it was applicable to private individuals. The trial court found in pertinent part:

4. There is no substantial evidence . . . or testimony that the defendants . . . acted maliciously, or with knowledge of the falsity of any of the alleged defamatory statements or with reckless disregard of whether the statements were false or not.

5. [The plaintiffs were private individuals.]

. . . . .

7. The disclosure of the defendants' confidential informants and the taped interviews would not be calculated to discover evidence that would tend to establish malice or reckless conduct by the defendants, and therefor [sic] entry of summary judgment should not be delayed, *Cervantes v. Time, Inc.*, 464 F.2d 986.

**B.** *Deputy sheriffs are public officials.*

■ A deputy sheriff is a public officer. *State ex rel. Baca v. Montoya*, 20 N.M. 104, 146 P. 956 (1915), held that a deputy county assessor who is required by statute to take an official oath is a public officer. A deputy sheriff is required by statute to take an official oath. Section 5–1–13(C), N.M.S.A. 1953 (Repl. Vol. 2, pt. 1). A deputy sheriff and a deputy county assessor are in the same class.

A deputy sheriff, a deputy marshall, a police officer, from the lowest to the highest rank in municipalities, are public officials. *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *Cline v. Brown*, 24 N.C.App. 209, 210 S.E.2d 446 (1974); *Rowden v. Amick*, 446 S.W.2d 849 (Mo.App.1969); *Moriarity v. Lippe*, 162 Conn. 371, 294 A.2d 326 (1972); *Scelfo v. Rutgers University*, 116 N.J.Super. 403, 282 A.2d 445 (1971); *Jackson v. Filliben*, 281 A.2d 604 (Del.1971); *Coursey v. Greater Niles Township Publishing Corp.*, 40 Ill.2d 257, 239 N.E.2d 837 (1968). See Annot., Libel and Slander: Who Is a Public Official, etc., 19 A.L.R.3d 1361 (1968).

The finding of the trial court that deputy sheriffs were not public officials was erroneous.

C. *Defendants failed to make a prima facie showing of lack of "actual malice."*

Defendants claim that "plaintiffs failed to produce proof of actual malice, making summary judgment for defendants appropriate." On motion for summary judgment, plaintiffs did not have this burden of proof. No trial took place. Summary judgment was entered. "Unquestionably the burden was on defendants to show an absence of a genuine issue of fact, or that they were entitled as a matter of law for some other reason to a summary judgment in their favor. [Citations omitted]. However, once defendants had made a prima facie showing that they were entitled to summary judgment, the burden was on plaintiff to show that there was a genuine factual issue and that defendants were not entitled as a matter of law to summary judgment." *Goodman v. Brock*, 83 N.M. 789, 792, 498 P.2d 676, 679 (1972). When a pleading or affidavit is properly made and is uncontroverted, it may be taken as true for purposes of passing upon the motion for summary judgment.

 Plaintiffs' complaint charged defendants with malicious falsification of the statements broadcast. Depositions and affidavits were filed. At this stage of the proceedings, plaintiffs did not have to prove anything. On motion for summary judgment in a defamation action, the defendants had the burden of removing the issue of actual malice from the case, *Tagawa v. Maui Publishing Company*, 427 P.2d 79, 84 (Hawaii, 1967), through uncontroverted depositions and affidavits, *Tagawa v. Maui Publishing Company*, 448 P.2d 337 (Hawaii, 1968). We do not believe defendants have removed "actual malice" from the case.

"Actual malice" in a defamation action means that KOB aired statements with knowledge of their falsity or with a reckless disregard of whether they were true or false. "Reckless disregard" means evidence that KOB had a high degree of awareness of probable falsity, or KOB entertained serious doubts as to the truth of the statements, but nevertheless aired the statements. *McNutt v. New Mexico State Tribune Company*, 88 N.M. 162, 538 P.2d 804 (Ct.App.1975).

This rule originated with *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964). It resolved a conflict between the constitutional doctrine of freedom of the press and the right of a public official not to be defamed. This conflict had to be measured by standards that satisfied the First Amendment to the Constitution of the United States on the principle of free speech. The constitutional safeguard was that the media had the right to an unfettered interchange of ideas to bring about such political and social changes that the people desired. Under this safeguard, we are committed to the principle that the media has the right to vehement, caustic, and unpleasantly sharp criticism of government and public officials. "But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz v. Welch*, 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974).

We must distinguish wide-open criticism from defamation. By criticism we mean a

broadcast that finds fault with the methods, policies and intentions of a public official. By defamation, we mean the circulation of a damaging falsehood against a public official. We commend wide-open criticism of public officials, but we do not commend broadcasts that defame the good name and reputation of a public official. If the media launch the publication knowing that it could ruin the reputation of a public figure, the public official becomes a victim. Nevertheless, the victim is given a heavy burden of proving culpability on the part of the publisher or broadcaster. One reason many cases result in summary judgment is that the victim's burden is difficult and in many cases impossible to meet, inasmuch as affirmative evidence of a knowing state of mind cannot be produced. See, Annot., Libel and Slander: What Constitutes Actual Malice, Within Federal Constitutional Rule Requiring Public Officials and Public Figures to Show Actual Malice, 20 A.L.R.3d 988 (1968).

We affirm the imposition of this burden on the victim because the media are entitled to the protection of the First Amendment standards fixed by the courts, standards by which they are safeguarded. Self-censorship should not be imposed on the media except where "actual malice" is proven by the victim with clear and convincing evidence. *Rosenbloom v. Metromedia, Inc.,* supra.

Following *New York Times Co.,* supra, the Supreme Court of the United States defined "reckless conduct" as false publication made by the media with a high degree of awareness of probable falsity, or sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication. *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

These are the rules adopted by this Court in *McNutt,* supra.

Under the doctrine of "reckless conduct," "[f]ailure to investigate does not in itself establish bad faith." *St. Amant,* supra [390 U.S. at 733, 88 S.Ct. at 1326]. Whether the failure of the media to investigate constitutes sufficient proof of "reckless disregard" in publication of the truth depends upon the state of the record. *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967). Restatement, Torts (Second) § 580A, Comment (d), says:

> Availability of sufficient time and opportunity to investigate the truth of the statement is a significant factor in determining whether the publisher was negligent (see § 580B, Comment *h*), *and it may have some relevance in determining whether the publisher acted with reckless disregard as to truth or falsity.* [Emphasis added]

We must bear in mind that KOB had an absolute, unconditional privilege to publish its criticism of the Sheriff's Department. Its broadcast was directed to that fact. But in these broadcasts specific defamatory statements were made against individual deputy sheriffs. We are now at the summary judgment stage of the proceedings.

The burden was on the defendants to make a prima facie showing that the statements aired were true, and if false, that defendants did not air the broadcasts with actual malice. Substantial truthfulness is a defense to an action for defamation. *Franklin v. Blank,* 86 N.M. 585, 525 P.2d 945 (Ct.App.1974).

Defendants' brief is replete with what plaintiffs failed to prove but nothing of what defendants proved. We have examined five volumes of the transcript and two depositions separately filed in this Court. We have gleaned the following facts from the record.

Defendants established through depositions taken by them of Landavazo, Ammerman and Golden that the following statements were false:

(a) That Landavazo spent time in the Arizona penitentiary.

(b) That Golden and Webb were at a race track in Santa Fe, not on any assigned case, and misused taxpayers' funds in the use of County vehicles.

(c) That Ammerman made two trips to El Paso to transport an illegal alien back to New Mexico to serve as a housekeeper to Sheriff Wilson, and that she was chosen because her "fate" was of personal interest to Ammerman.

We can find no evidence that defendants were free of actual malice in making the broadcasts.

The only evidence of record produced by defendants, generally applicable, was the cross-examination of Zani by his attorney at a deposition. Zani stated that he had reason to believe the statements aired in the broadcast were true and not false, and the information would be beneficial to the public.

*With reference to Landavazo,* Zani and Dimond, by affidavit, related the investigation of Landavazo and other information given them by confidential informants. They say that this information was checked out and it was true. The truth could only be determined by contacting Landavazo, the Arizona State Penitentiary or the Federal Bureau of Investigation. They telephoned Landavazo at home at 2:00 a. m. and awakened him from sleep. Landavazo was angry and did not answer the question. They called an agent of the Federal Bureau of Investigation in Albuquerque and he told them it was against policy to release such information. Yet the plaintiffs filed a negative report from the F.B.I. By deposition, Zani was asked whether he ever called the Arizona State Penitentiary, and his answer was *"No, sir. Again, I was not concerned about time, the prison time."* The Custodian of Records of the Arizona State Penitentiary, by affidavit, stated that the information was available to anyone who would call. Zani and Dimond did not verify the truth of the statement aired because they were not concerned about prison time. Yet, they say they published all of the informants' statements in good faith and without malice, believing their statements were true.

*With reference to Ammerman,* Joseph P. Collins, Jr., Chief of Detectives for Sheriff Wilson, by affidavit, stated that prior to the broadcast, Richard McKee, general manager of KOB, arranged for a meeting at his office at Radio Station KOB. Also present were Zani and Dimond. They questioned him about Ammerman's trip to El Paso. He "told them that if they had information that Mr. Ammerman had transported a wetback maid from Juarez that it was absolutely false."

Plaintiff Webb, by affidavit, stated that he had a conversation with Zani sometime between June 24th and August 1, 1975, regarding the allegations published in the broadcasts as follows:

During that conversation, Leo Zani admitted to me that he knew that many of the allegations made during all of the broadcasts which are the subject matter of the consolidated lawsuits were untrue, but were nevertheless broadcast because "they were news."

Dimond testified that when she began the investigation of the Sheriff's Department, she received hundreds of anonymous telephone calls. Many times she heard back from the same people and she didn't know whether she ever met them. When asked what information the anonymous callers gave, she said "I can't even begin to tell you everything." She checked out the information and it "usually panned out. If it didn't, we dropped it." Her profession of good faith may not have been based "wholly" on the unverified *anonymous* telephone calls, but defendants denied plaintiffs the names of the confidential informants and the right to determine what information was given from anonymous callers who became confidential informants.

There were obvious reasons to doubt the veracity of the informants because the trial court found that the credibility of the confidential informants and the reliability of the confidential information had been established as an issue in the case.

*St. Amant v. Thompson,* supra, says:
The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published

with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. *Professions of good faith will be unlikely to prove persuasive, for example, where a story* is fabricated by the defendant, is a product of his imagination, *or is based wholly on an unverified anonymous telephone call.* Nor will they be likely to prevail when the publisher's allegations are *so inherently unprobable* that only a reckless man would have put them in circulation. *Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.* [Emphasis added] [390 U.S. at 732, 88 S.Ct. at 1326.]

Defendants' challenged statements have been traced to unidentified sources. They were not traced to an identified source. When a defendant traces his challenged statements to an *identified* source, it does not constitute a "reckless disregard for the truth." *New York Times Company v. Connor*, 365 F.2d 567 (5th Cir. 1966).

There was no evidence that defendants lacked knowledge as to the falsity of the statements, nor any evidence that they lacked a high degree of awareness of probable falsity or that they did not entertain any serious doubts as to the truth or the statements aired. Defendants failed to make a prima facie showing of lack of actual malice.

D. *There are genuine issues of material fact as to Ammerman and Landavazo.*

*Ammerman* presented evidence by Collins that, prior to the broadcast of June 13, 1975, Collins told KOB that any information that Ammerman had transported a wetback maid from Juarez was absolutely false. This was evidence that KOB knew it was false and yet KOB aired this false information.

KOB presented evidence that it did not call the Arizona State Penitentiary to verify any imprisonment of *Landavazo* because it was not concerned with prison time. This

evidence presents an issue of fact as to whether the broadcast was aired with a reckless disregard of the truth.

Ammerman and Landavazo have established that genuine issues of material fact exist on the issue of actual malice.

E. *Summary judgment was premature as to Golden and Webb.*

With reference to Golden and Webb, defendants must produce evidence by deposition or affidavit that defendants did not have knowledge of the falsity of statements made by KOB or that defendants did not broadcast the false statements with reckless disregard of the truth. If this duty is performed, the burden shifts to Golden and Webb to establish that a genuine issue of material fact exists.

Defendants' statements were based solely on the confidential sources in question.

In *Peagler v. Phoenix Newspapers, Inc.*, 114 Ariz. 309, 560 P.2d 1216 (1977), the defendant published an article about plaintiff written by Albert Sitter, a reporter. In the article, Mrs. Runser of the Phoenix office of the Better Business Bureau allegedly told the reporter that plaintiff was one of three firms with the longest record of unresolved consumer complaints that were allowed to remain members of BBB. Summary judgment was granted defendant. It was reversed. Mrs. Runser was asked this question, to which she made this answer:

Q. "Did you tell him [Sitter] in any context that the greatest number of complaints on file at the Better Business Bureau against any one company was lodged against Peagler's Dodge City?"

A. "No."

The Court said:

The jury could, therefore, have concluded that Sitter was aware that the article was false or that he published it in a reckless disregard of whether it was true or false. [560 P.2d at 1223]

Webb's affidavit does not meet the specificity set forth in *Peagler*. It stated that in a conversation with Zani:

. . . Leo Zani admitted to me that he knew that many of the allegations made during all of the broadcasts . . were untrue, but were nevertheless broadcast because "they were news".

Zani's admission was general in nature and it is questionable whether "many of the allegations made" included Webb and Golden. "Many allegations made" does not mean "all allegations made." The broadcast referred to persons and events not included in these judicial proceedings. Inferences of a general nature can be drawn, but in order to make the inferences applicable to Gordon and Webb, as well as Ammerman and Landavazo, the circumstances surrounding the conversation must be amplified to determine the extent of the admission and what reasonable inferences can be drawn to determine whether the particular statements broadcast were admitted to be untrue. To create an issue of material fact, the affidavit must be based upon facts known to the affiant. These facts must be stated clearly and unequivocally.

If defendants' lack of actual malice is uncontroverted, the defendants are entitled to summary judgment against Golden and Webb.

Plaintiffs claim that the summary judgment is premature because they were denied additional discovery; that the denial of disclosure of the names of the confidential informants, and the information they would disclose was essential. This claim is valid if plaintiffs are entitled to the names and testimony of these confidential informants.

■ The First Amendment does not grant a broadcaster any privilege, qualified or absolute, to refuse to reveal confidential information which is admittedly relevant to a court proceeding. *Dow Jones & Company, Inc. v. Superior Court*, 364 Mass. 317, 303 N.E.2d 847 (1973); *Carey v. Hume*, 160 U.S.App. 365, 492 F.2d 631 (1974); See Annot., Privilege of Newspaper or Magazine and Persons Connected Therewith Not to Disclose Communications, etc., 7 A.L.R.3d 591 (1966). *Cervantes v. Time, Inc.*, 464 F.2d 986, 994 (8th Cir. 1972) says:

*Where there is a concrete demonstration that the identity of defense news sources will lead to persuasive evidence on the issue of malice*, a District Court should not reach the merits of a defense motion for summary judgment until and unless the plaintiff is first given a meaningful opportunity to cross-examine these sources, whether they be anonymous or known. For only then can it be said that no genuine issue remains to be tried. [Emphasis added]

To determine whether defendants' news sources will lead to persuasive evidence on the issue of malice, we are governed by Rule 510(c)(3) of the Rules of Evidence [§ 20–4–510(c)(3), N.M.S.A. 1953 (Repl. Vol. 4, 1975 Supp.)]. It reads in part:

If information from an informer is relied upon to establish the legality of the means by which evidence was obtained and the judge is not satisfied that the information was received from an informer reasonably believed to be reliable or credible, he may require the identity of the informer to be disclosed. *The judges may permit the disclosure to be made in camera or make any other order which justice requires.* [Emphasis added]

■ The trial court entered its order. The defendants have agreed to comply with this order. After an *in camera* inspection, the trial court will then determine whether the identity of the confidential informants will lead to persuasive evidence on the issue of actual malice. This determination will include findings of whether defendants in fact had reliable sources, whether defendants misrepresented the reports of their sources, whether defendants had prior knowledge of falsity, and whether reliance upon these particular sources was reckless. Until the trial court renders its decision, summary judgment is premature.

Without holding an *in camera* proceeding, the trial court found that disclosure "would not be calculated to discover evidence that would tend to establish malice or reckless conduct by the defendants, and therefor [sic] entry of summary judgment should not be delayed, *Cervantes v. Time, Inc.*, 464

F.2d 986." The trial court had overlooked its prior order of disclosure. *Cervantes* is not controlling in this case. In *Cervantes*, the summary judgment was affirmed because the Life reporter collected and documented data over a period of many months, and Life's key personnel spent countless hours corroborating and evaluating this data, and Cervantes was provided with hundreds of documents utilized in preparation of the article, and Cervantes deposed virtually every Life employee who possessed any connection whatever with the article's preparation and publication and, with one exception, *each affirmed his or her belief in the truth of the article*, and Cervantes made a minimal assault on the truth of the matter, and failed to produce a scintilla of proof supportive of a finding that either in fact entertained *serious doubts about the truth* of a single sentence in the article, and that the article was published in good faith without regard to the identity of the news sources.

The Courts said:

> Thus, if, in the course of pretrial discovery, [plaintiff] uncovers substantial evidence *tending to show* that defendant's published assertions are so inherently improbable *that there are strong reasons to doubt the veracity of the defense informant or the accuracy of his reports*, the reasons favoring compulsory disclosure in advance of a ruling on the summary judgment motion should become more compelling. Similarly, where pretrial discovery produces *some factor* which would support the conclusion that the defendant in fact entertained serious doubt as to the truth of the matters published, identification and examination of defense news sources seemingly would be in order, and traditional summary judgment doctrine would command pursuit of further discovery prior to adjudication of a summary judgment motion. *The point of principal importance is that there must be a showing of cognizable prejudice before the failure to permit examination of anonymous news sources can rise to the level of error. Mere speculation or conjecture about the fruits of such examination simply will not suffice.* [Emphasis added] [464 F.2d at 994]

*Cervantes* supports the trial court's order that an *in camera* proceeding be held because plaintiffs produced substantial evidence that there were strong reasons to doubt the veracity of the defense informants. The trial court delayed summary judgment until it changed the course of proceedings and entered summary judgment. This was reversible error.

Apart from the issues in the case, defendants presented several affidavits, one by a confidential informant, that one of the plaintiffs was a brutal, vicious person who would seek retribution. This factor may have influenced the change of course. We appreciate the serious consequences that may flow from disclosure, but we also know that anger and hatred often flow emotionally when informants make false accusations that impugn the character and reputation of a public officer. The heavy burden of determining disclosure of defense informants rests on the trial court.

Summary judgment is reversed. This case is remanded to the trial court to allow defendants to make an additional showing that there was no actual malice with reference to Golden and Webb; that Golden and Webb be allowed to make an additional showing that there was actual malice; that the trial court hold an *in camera* proceeding to determine whether informants are reliable persons and the reports given are accurate, and render a decision whether defense informants should be disclosed to all plaintiffs. Defendants' motion for summary judgment may then be considered with reference to Golden and Webb and a decision rendered thereon.

IT IS SO ORDERED.

LOPEZ, J. and THOMAS A. SANDENAW, Jr., D. J., concur.