[Civ. No. 42729. Second Dist., Div. Three. June 28, 1974.]

MARY JULIET O'HILDERBRANDT, Plaintiff and Appellant, v. COLUMBIA BROADCASTING SYSTEM, INC., et al., Defendants and Respondents.

324

---

## Counsel

Henry H. Angell for Plaintiff and Appellant.

Lillick, McHose, Wheat, Adams & Charles, Anthony Liebig and Douglas S. Westwater for Defendants and Respondents.

## OPINION

**FORD, P. J.**—Plaintiff, a former motion picture actress known as Mary Miles Minter, brought this action to recover damages for invasion of her privacy by television broadcasts of a program relating in part to the involvement of women in crimes of murder. The defendants are the broadcasting company, the individual who narrated the program, and the commercial advertisers who sponsored the telecasts. In the course of the trial by jury a judgment of nonsuit was granted. Plaintiff has appealed from the judgment.

Plaintiff testified that she was born on April 1, 1902. Her career as an actress began in 1907. In 1916 she and her mother moved to Santa Barbara, California. She met William Desmond Taylor shortly after she was 17 years old and he directed her in motion pictures. She became engaged to be married to Mr. Taylor. A young actress, Mabel Normand, was a friend of plaintiff and of Mr. Taylor. He was murdered on or about February 1, 1922. It took plaintiff a year thereafter to complete her motion picture contract. Thereupon, early in 1923 before she had reached the age of 21 years, she terminated her career as a motion picture actress. She never again appeared before the public in any capacity.

On February 15, 1970, while plaintiff was watching television, a program entitled "Rod Serling's Wonderful World of Crime" was shown. Plaintiff testified: ". . . and it went on and on for a while and then . . . I couldn't believe my eyes, there was a strip of five pictures like something either cut out or imposed upon the white TV screen and the frames oval, not quite round, five women's pictures' heads in those frames. The first was Winnie Ruth Judd, the second, cute little Mabel Normand, the middle one was me as I looked just after I met Mr. Taylor, the next one was . . . my mother, Charlotte Shelby, innocent of any harm to him, and here was Louise Peete—we used to see her wheeling Mr. Jacob, I think, Denton, he had a house on the same corner as we did near the Ambassador Hotel, to say hello. . . . he was found in fresh cement in his basement. There was Winnie Ruth Judd, a real murderer, Louise Peete, a horrible murderess."

The parties agree that a substantially accurate transcript of the pertinent oral portions of the telecast is as follows: "We are inclined to feel nostalgic about anything old, including crime, and especially murder. Murder is the unlawful taking of human life with malice aforethought. It is forbidden by the sixth of the Ten Commandments, and though some

crimes are held equal to it, none is more blameworthy. Yet the act of murder is at the core of our most enduring literature. From the story of Genesis to the story of Hamlet, in literature as in history, we not only tolerate murder, we relish it. The locality of a murder, as soon as the mists of time have closed in on it, becomes a special place. The deed itself becomes an historical event. And the murder[er] an historical figure. There is no such historic figure in the murder of William Desmond Taylor. No murderer was ever caught, nor does the murder scene exist. It did exist on South Alvarado Street, in Los Angeles, but has since been murdered by a shopping center. The victim was a movie director of the kind likely to arouse warm feelings in some women, and jealousy. His name was linked romantically with Mabel Norman[d], ingenue of the Mack Sennett Comedies, but he had other strings to his bow; it was no secret that Mary Miles Minter considered herself engaged to William Desmond Taylor. Miss Minter was the first star ever to sign a million-dollar contract, and since her mother, Charlotte Shelby, was still the guardian of the girl's wealth, she did not view her daughter's impending marriage with any great favor. Nor could Miss Norman[d], who was still in the warmest terms with Taylor and whose picture set next to his bed inscribed 'Oh, My Dearest!' At any rate *la dolce vita* came to an end for Taylor one February night in 1922. He was left on the floor of his Alvarado Street apartment the worse for a 38 slug. A shrouded figure was observed by a neighbor running from the scene. It could have been a man. It could have been a woman. Today, forty-eight years after death and funeral, no one knows which it was. Given the choice, both police and posterity like to think it was a woman. In the annals of crime, the murderer is tolerated. The murderess is preferred; and in the annals of Los Angeles crime, few *men* can match Louise Peete in terms of energy, resource and dedication to the art of homicide. During the summer of 1920 in his house in Los Angeles, Mrs. Peete did shoot and kill and bury in the basement one Jacob Denton, not because she wanted him dead but because she wanted his money. Duly tried, and duly convicted, Mrs. Peete was sent to jail. Emerging nineteen years later, having theoretically learned her lesson, she was befriended and sheltered in a house on the Palisades by a woman, Margaret Logan. In the spring of 1943, Mrs. Peete did shoot and kill and bury in the backyard one Margaret Logan, not because she wanted her dead, but because she wanted her money. In the spring of 1944 the people of California did condemn, and in the spring of 1947 did execute, one Louise Peete, not because they wanted her money but because they wanted her dead. The persistence of Louise Peete is matched by the ingenuity of Winnie Ruth Judd. In 1931, in Phoenix, Mrs. Judd did kill

and butcher two young women, her two best friends; she divided them neatly into three pieces of luggage and traveled with them to Los Angeles, where the consignment attracted the notice of the authorities. Duly tried, convicted and consigned to the Arizona State Mental Hospital, Mrs. Judd escaped a total of six times. In later years the authorities and the public formed a rooting section in her behalf. You could almost say we have forgiven Mrs. Judd for one of the bloodiest crimes ever committed until recently. The Sharon Tate murders happened last year and last year is much too recent a time for us to view them with historic detachment. Today we can't view this quintuple murder as an historic event and we can hardly view the people arrested in connection with it as historic figures. Today we look upon the Sharon Tate massacre as the grubbiest kind of a deed. That is all murder ever is and that is all it ever will be."

With respect to the effect on her of the telecast of February 15, 1970, plaintiff testified as follows: "My feelings were utterly outraged and all of the love I felt for that man, desire to have him live, came back overwhelmingly, it hurt me deeply. . . . The suggestion and the suspicion of murder that—with this vicious attack upon me that I was cast in the false and unspeakably cruel light of having been the actual perpetrator of his murderer—I mean of his murder, me, me of hurting him! To say it distressed me, I will say that because it's a quiet word, it did a great deal more than that, I have never been the same since. It gave me a terrible dread, most people I know liked me, loved me, and I loved them. I couldn't expect total strangers to have any confidence in me if I was an uncaught murderess who had gotten away with something. It gave me a dread of what the public would think of me and my own neighbors next door all around me. It made me wonder where the next attack was going to come, like a bolt out of the blue, and it did the very next Saturday."[1]

In the course of the cross-examination plaintiff testified that she was still contacted by people who wanted to interview her and do stories about her. A further portion of her testimony was: "Q. You will agree with me that your personal history in motion pictures has been the subject of quite a bit of commentary in published books on motion pictures? . . . THE WITNESS: Yes. Q. BY MR. LIEBIG [defendants' counsel]: And you will agree with me, I assume, that the William Desmond Taylor murder has been the subject of quite a few articles in both magazines and books? A. Tragically, tragically so."

---

[1]Plaintiff was apparently referring to the rebroadcast of the program on February 21, 1970.

█ The law applicable to appellate review of a judgment of nonsuit was succinctly stated in *Miller* v. *Los Angeles County Flood Control Dist.,* 8 Cal.3d 689, at page 699 [106 Cal.Rptr. 1, 505 P.2d 193], as follows: "In reviewing the judgment, we are careful to apply longstanding rules governing nonsuits which require us to view the evidence in the light most favorable to the plaintiffs and to disregard conflicting evidence on behalf of defendant. Only if, after indulging in every legitimate inference favorable to plaintiffs, we find that there is no evidence of sufficient substantiality to support a verdict in plaintiffs' favor, can we uphold the judgment of nonsuit."

The core of plaintiff's position is expressed in her opening brief in the following words (citations to the record being omitted herein): "Were plaintiff endeavoring to prove as the gist of her action that the defendants had defamed her by identifying her as a murderess or woman of loose morals it is improbable that she could ever make out a case. . . . The language used in the script boils down in the cold eye of reason to something less than calling plaintiff a criminal or unchaste. Here from the script is the conclusion of the Taylor episode: 'A shrouded figure was observed by a neighbor running from the scene. It could have been a man. It could have been a woman. Today, forty-eight years after death and funeral, no one knows which it was. Given a choice, both police and posterity like to think it was a woman.' [¶] 'In the annals of crime the murderer is tolerated; the murderess is preferred.' This is the statement following the quoted matter in the foregoing paragraph, and it is placed in its strategic position in the broadcast's dialogue to epitomize the suggestive values in what has gone before as well as to connect up the mystery in the unsolved Taylor murder with the brutish details in what is about to come in crimes of known murderesses. The *modus operandi* of such shows as this is to titillate, to arouse the vain fancies of their audiences, to appeal to unreason and unreality. Lies are reliable matters of substance when taken in comparison with these vanities. . . . [¶] Here we truly reach a kind of hyphenated never, never land of degradation—entertainment—moralization where nothing but the obvious is said for certain and little if anything factual is definitely insinuated. What is intended and must in an inquiry like this one be deemed as attained by the defendants is that the listeners through their own suggestibility and credulousness, and lacking any need on their part for reflection or deliberation upon the thin gruel supplied to them, are left with a feeling of repugnance and general distaste for the character, social standing and reputation of plaintiff and all the named characters within the entire topic of murder as well as crime generally."

At a later point in plaintiff's opening brief it is stated that "the statements made concerning plaintiff were substantially true" but that the "wrong of which plaintiff complains was in mentioning and showing her pictures at all in a context of crime, perversion, depravity and conjecture, that is, identifying her at all in the context of the show." In plaintiff's reply brief it is stated: "A matter of conjecture arising from this context is whether the plaintiff was not herself the murderess of Taylor."

In *Fairfield* v. *American Photocopy etc. Co.,* 138 Cal.App.2d 82, at pages 86-87 [291 P.2d 194], the court stated: "The gist of the cause of action in a privacy case is not injury to the character or reputation, but a direct wrong of a personal character resulting in injury to the feelings without regard to any effect which the publication may have on the property, business, pecuniary interest, or the standing of the individual in the community. [Citations.] The right of privacy concerns one's own peace of mind, while the right of freedom from defamation concerns primarily one's reputation. [Citations.] The injury is mental and subjective. It impairs the mental peace and comfort of the person and may cause suffering much more acute than that caused by a bodily injury."[2] Prosser takes a somewhat different view with respect to the form of invasion of privacy designated as that which consists of publicity which places the plaintiff in a false light in the public eye: "The false light cases obviously differ from those of intrusion, or disclosure of private facts. The interest protected is clearly that of reputation, with the same overtones of mental distress as in defamation." (Prosser, *Privacy* (1960) 48 Cal.L.Rev. 383, 400.)

It is manifest from the record in this case that in 1923 when plaintiff chose to terminate her career as a motion picture actress, she was a public personage even though she was then less than 21 years old. The unsolved murder of William Desmond Taylor in the previous year was an occurrence which received widespread publicity. As will be explained, if the telecast had been limited to that occurrence and to the fact of plaintiff's professional and social relationship with Mr. Taylor, there would be no basis for a cause of action for invasion of plaintiff's right of privacy.

While plaintiff's fame had undoubtedly declined in the intervening period of nearly half a century, plaintiff's own testimony showed that it had not come to an end and that at the time of the telecast she was still a person as to whom there was a public interest. In *Carlisle* v. *Fawcett*

---

[2]In *Time, Inc.* v. *Hill,* 385 U.S. 374, 384, fn. 9 [17 L.Ed.2d 456, 465, 87 S.Ct. 534], it was stated: "In the 'right of privacy' cases the primary damage is the mental distress from having been exposed to public view, although injury to reputation may be an element bearing upon such damage."

*Publications, Inc.*, 201 Cal.App.2d 733, at pages 746-747 [20 Cal.Rptr. 405], the court stated: ". . . there is a public interest which attaches to people who by their accomplishments, mode of living, professional standing or calling, create a legitimate and wide-spread attention to their activities. Certainly, the accomplishments and way of life of those who have achieved a marked reputation or notoriety by appearing before the public such as actors and actresses, professional athletes, public officers, noted inventors, explorers, war heroes, may legitimately be mentioned and discussed in print or on radio or television. Such public figures have to some extent lost the right of privacy, and it is proper to go further in dealing with their lives and public activities than with those of entirely private persons. [Citations.] [¶] As is said in *Werner* v. *Times-Mirror Co., supra,* 193 Cal.App.2d 111, 117 [14 Cal.Rptr. 208]: 'A person may, by his own activities or by the force of circumstances, become a public personage and thereby relinquish a part of his right of privacy to the extent that the public has a legitimate interest in his doings, affairs, or character.' "

But even though an individual has acquired the status of a public personage, a difficult problem is the effect of the lapse of time upon the right to publicly communicate matters concerning that person which, when they were current, were clearly of legitimate interest to the public. Prosser has stated: "There can be no doubt that one quite legitimate function of the press is that of educating or reminding the public as to past history, and that the recall of former public figures, the revival of past events that once were news, can properly be a matter of present public interest." (Prosser, *Privacy, supra,* 48 Cal.L.Rev. 383, 418.)

While the case of *Smith* v. *National Broadcasting Co.*, 138 Cal.App.2d 807 [292 P.2d 600], related factually to a lapse of time of only three months, the sound view of the law applicable to a lapse of time of the nature of that in the case presently before this court is stated therein (p. 814) as follows: "It is characteristic of every era, no less than of our contemporary world, that events which have caught the popular imagination or incidents which have aroused the public interest, have been frequently revivified long after their occurrence in the literature, journalism, or other media of communication of a later day. These events, being embedded in communal history, are proper material for such recounting. It is well established, therefore, that the mere passage of time does not preclude the publication of such incidents from the life of one formerly in the public eye which are already public property."

In *Kapellas* v. *Kofman,* 1 Cal.3d 20 [81 Cal.Rptr. 360, 459 P.2d 912], at page 36, the Supreme Court stated: "If the information reported has

previously become part of the 'public domain' or the intrusion into an individual's private life is only slight, publication will be privileged even though the social utility of the publication may be minimal."

In the light of the governing law, there has been no actionable invasion of plaintiff's right to privacy if the portion of the telecast concerning the William Desmond Taylor murder is considered separately from those portions thereof relating to the crimes committed by Louise Peete and Winnie Ruth Judd.

However, as has been noted hereinabove, plaintiff's position is that her privacy was invaded in that her name was mentioned and her picture shown "in a context of crime, perversion, depravity and conjecture." In short, her grievance appears to be that she as a person was injected into a televised discourse on crime, particularly murder, with which subject she had no reasonable connection, the implication being that there was at least the possibility that such a connection did exist. If there is merit in plaintiff's position, the kind of invasion of privacy involved is that which consists of publicity which places the plaintiff in a false light in the public eye, the false light not necessarily being a defamatory one. (See Prosser on Torts (4th ed. 1971) § 117, p. 812.)

In discussing the false light concept Prosser commented (footnotes as to particular cases being omitted herein): "Another form in which this branch of the tort frequently has made its appearance is the use of the plaintiff's picture to illustrate a book or an article with which he has no reasonable connection. As remains to be seen, public interest may justify a use for appropriate and pertinent illustration. But when the face of some quite innocent and unrelated citizen is employed to ornament an article on the cheating propensities of taxi drivers, the negligence of children, profane love, 'man hungry' women, juvenile delinquents, or the peddling of narcotics, there is an obvious innuendo that the article applies to him, which places him in a false light before the public, and is actionable." (Prosser, *Privacy* (1960) *supra*, 48 Cal.L.Rev. 383, 399.)

The case cited by Prosser as to "the negligence of children" is *Leverton v. Curtis Pub. Co.* (3d Cir, 1951) 192 F.2d 974. The plaintiff therein had been involved in a street accident in Birmingham, Alabama, when she was 10 years old. A motor car nearly ran over her. A newspaper photographer happened to be on the spot and he took a photograph of the child being lifted to her feet by a woman bystander. The dramatic effect of the picture arose from the fact that it was an action picture, not one posed for the camera. On the next day the picture appeared in a Birmingham newspaper.

Twenty months later it was used by the Curtis Publishing Company as an illustration for an article on traffic accidents, emphasis being placed on pedestrian carelessness, under the title "They Ask to Be Killed," the author being David G. Wittels. Curtis had purchased the print from a supplier of illustration material. Plaintiff claimed that the publication of her picture at such a length of time after the accident in which she was involved constituted a violation of her right to privacy.

In *Leverton* the plaintiff admitted that the original publication in the Birmingham newspaper on the day following her accident was not an actionable invasion of her right to privacy. The court stated (192 F.2d at pp. 977-978): "It could be easily agreed that the plaintiff in this case, because she was once involved in an automobile accident does not continue throughout her life to have her goings and comings made the subject of newspaper stories. That, however, is a long way from saying that the occasion of her once becoming a subject of public interest cannot be brought again to public attention later on. Suppose the same newspaper which printed the plaintiff's photograph the day after her accident printed a résumé sometime later of traffic accidents and supplied pictures dealing with them, including this one, which photographers on its staff had compiled. We cannot think that their publication under those circumstances would subject the publisher to liability. . . . The first publication of the plaintiff's photograph was purely news. The second publication was a sort of dramatic setting for the discussion of a traffic problem by Mr. Wittels. Does that much of a change in the purpose of the publication lose the privilege? . . . [W]e think this particular publication was an actionable invasion of plaintiff's right of privacy. Granted that she was 'newsworthy' with regard to her traffic accident. Assume, also, that she continued to be newsworthy with regard to that particular accident for an indefinite time afterward. This use of her picture had nothing at all to do with her accident. It related to the general subject of traffic accidents and pedestrian carelessness. Yet the facts, so far as we know them in this case, show that the little girl, herself, was at the time of her accident not careless and the motorist was. The picture is used in connection with several headings tending to say that this plaintiff narrowly escaped death because she was careless of her own safety. . . . The heading of the article was called 'They Ask To Be Killed.' Underneath the picture of the little girl was the heading 'Safety education in schools has reduced child accidents measurably, but unpredictable darting through traffic still takes a sobering toll.' In a box beside the title appears the following: 'Do you invite massacre by your own carelessness? Here's how thousands have committed suicide by scorning laws that were passed to keep them alive.' The sum total of all this is that this

particular plaintiff, the legitimate subject for publicity for one particular accident, now becomes a pictorial, frightful example of pedestrian carelessness. This, we think, exceeds the bounds of privilege."

*Leverton* is factually distinguishable from the case presently before this court. ■ Here plaintiff was a public personage at the time of the William Desmond Taylor murder and remained so, although in lesser degree, at the time of the telecast. The Taylor murder was newsworthy at the time it occurred and, under the authorities cited hereinabove, was in the public domain and still a matter of proper public interest when "Rod Serling's Wonderful World of Crime" was broadcast. Unlike the situation in *Leverton,* the segment of the program which directly involved plaintiff related to the Taylor murder incident of 1922. Insofar as that happening was concerned, it cannot be said that plaintiff was improperly injected into that particular portion of the program to illustrate a commentary on a subject with respect to which she had no reasonable connection.

It is, of course, true that those viewers of the telecast who were prone to give their imaginations unrestrained leeway might speculate that the "shrouded figure" who was observed by a neighbor running from the scene of the Taylor tragedy was one of the three women named—Charlotte Shelby, Mabel Normand, Mary Miles Minter—on the theory that a hostile motive might have existed on the part of one or more of them. But a similar newsworthy article published as of the time of the murder incident would also be likely to lead to such idle and reckless speculation. That probability must, of course, be considered in the light of the First Amendment to the United States Constitution, a subject to which we now turn.

As has been noted hereinabove, plaintiff concedes that "the statements made concerning plaintiff were substantially true," but she states that the wrong of which she complains "was in mentioning [her name] and showing her pictures at all in a context of crime, perversion, depravity and conjecture, that is, identifying her at all in the context of the show." In *Briscoe* v. *Reader's Digest Association, Inc.,* 4 Cal.3d 529, at page 541 [93 Cal.Rptr. 866, 483 P.2d 34], the court stated: *"In Time, Inc.* v. *Hill, supra,* 385 U.S. 374, 383 [17 L.Ed.2d 456, 464], the United States Supreme Court considered some of these same balancing problems with regard to a different form of invasion of privacy, that of placing the individual in a false light in the public eye. The New York statute construed in *Time* did not create a right of action for the truthful report of newsworthy people or events. [Fn. omitted.] The Supreme Court stated, however, that '[t]his limitation to newsworthy persons and events does not of course foreclose an

interpretation . . . to allow damages where "Revelations may be so intimate and so unwarranted in view of the victim's position as to outrage the community's notions of decency." . . .' (385 U.S. at p. 383, fn. 7 [17 L.Ed.2d at p. 464].) Thus a truthful publication is constitutionally protected if (1) it is newsworthy and (2) it does not reveal facts so offensive as to shock the community's notions of decency."

In *Kapellas* v. *Kofman, supra,* 1 Cal.3d 20, at pages 35-36, the court stated: "With the expansion of the common law's protection of an individual's privacy, [fn. omitted] came a concomitant recognition of an equally important, and constitutionally enshrined, competing interest of the public in information of newsworthy matters. Sensitive to the privacy tort's potential encroachment on the freedoms of speech and the press, our courts have recognized a broad privilege cloaking the truthful publication of all newsworthy matters. [Citations.]"

The question remaining is that of the legal significance of the fact that immediately following the recital of the circumstances of the William Desmond Taylor murder, the narrator proceeded to set forth the sensational stories of the murders committed by Louise Peete and Winnie Ruth Judd. But under the governing law as set forth hereinabove those portions of the program involved no tortious publication. As stated in *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d 529, at page 537: "We have no doubt that reports of the facts of past crimes are newsworthy. Media publication of the circumstances under which crimes were committed in the past may prove educational in the same way that reports of current crimes do. The public has a strong interest in enforcing the law, and this interest is served by accumulating and disseminating data cataloguing the reasons men commit crimes, the methods they use, and the ways in which they are apprehended."

While it may not have been in good taste to place the recitation of plaintiff's professional and social relationship with the murdered William Desmond Taylor in juxtaposition with the story of the heinous deeds of Louise Peete and Winnie Ruth Judd, that circumstance was not, as a matter of law, so offensive as to shock the community's notions of decency. As stated in *Kelley* v. *Post Publishing Co.,* 327 Mass. 275, at page 278 [98 N.E.2d 286, at page 287]: "The law does not provide a remedy for every annoyance that occurs in everyday life. Many things which are distressing or may be lacking in propriety or good taste are not actionable."

In view of the determination reached herein, no purpose would be served by a discussion of the significance of malice with respect to an

action for invasion of privacy. (See *Time, Inc.* v. *Hill, supra,* 385 U.S. 374, 390, 394 [17 L.Ed.2d 456, 468, 470].)

The judgment is affirmed.

Potter, J., concurred.

Allport, J., dissented.

Appellant's petition for a hearing by the Supreme Court was denied August 21, 1974.