[No. E027632. Fourth Dist., Div. Two. May 30, 2001.]

M. G., a Minor, etc., et al., Plaintiffs and Respondents, v.
TIME WARNER, INC., et al., Defendants and Appellants.

624

**COUNSEL**

O'Melveny & Myers, Robert C. Vanderet, Neil S. Jahss; Paul G. Gardephe; and Lawrence H. Tribe for Defendants and Appellants.

The Cifarelli Law Firm, Thomas A. Cifarelli, Philip C. Cifarelli, Douglas A. Estes; Shernoff, Bidart & Darras and Michael J. Bidart for Plaintiffs and Respondents.

**OPINION**

**GAUT, J.—**

### 1. *Introduction*

In September 1999, Sports Illustrated and an HBO television program, Real Sports, used the 1997 team photograph of a Little League team to illustrate stories about adult coaches who sexually molest youths playing team sports. Plaintiffs, all of whom appear in the photograph, were formerly players or coaches on the Little League team. The team's manager, Norman Watson, pleaded guilty to molesting five children he had coached in Little League. Plaintiffs have sued defendants and appellants, hereafter referred to as Time Warner or the media defendants, for invasion of privacy and infliction of emotional distress.

Time Warner brought a motion to strike plaintiffs' complaint pursuant to Code of Civil Procedure section 425.16, the so-called anti-SLAPP statute. SLAPP is the acronym for "strategic lawsuits against public participation."[1] The trial court denied the SLAPP motion, ruling that plaintiffs had a reasonable probability of succeeding on their claims, particularly that for public disclosure of a private fact.

Time Warner now appeals. We affirm, holding that plaintiffs have demonstrated a prima facie case for invasion of privacy.

### 2. *Facts*

The 10 plaintiffs were eight players and two coaches for a Little League team in Highland, California. Norman Watson was the team's manager in 1996 and 1997, until it was discovered in September 1997 that he had a long history of sexually abusing children, beginning with a molestation conviction in 1971. Watson pleaded guilty in April 1998.

In September 1999, Sports Illustrated published a cover story, *Every Parent's Nightmare*, on incidents of child molestation in youth sports. Using Watson as one example, the article reported Watson had "pleaded guilty to 39 counts of lewd acts with children, four boys and a girl, that had occurred between 1990 and '96, when Watson was a San Bernardino Little League coach and umpire and the five kids were all playing in the league." Watson was further described as having "spent most of his 54 years sexually preying on children . . . [m]ost of . . . whom he first met through his work in Little League."

---

[1] *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 813 [33 Cal.Rptr.2d 446].

Accompanying the article was a team photograph of 18 people, including the 10 plaintiffs in this case. The photograph featured a sign board reading: "East Baseline S_____ P_____ 1997." (We use only the team's initials to preserve its members from further notoriety.) The photograph also bore a caption: "**A fixture** Watson (center, in black) coached for years not far from a hospital where he'd been incarcerated as a molester."

Also in September 1999, HBO broadcast a similar report on child molesters in youth sports. The story discussed Watson and his involvement with plaintiffs' team. The story employed a fleeting shot of the team photograph.

The Sports Illustrated article and the HBO program did not name any of the people shown in the team photograph except Watson. The article did not identify any of Watson's victims by his or her real name. Two victims were identified by pseudonyms. One player, who is not a plaintiff, was interviewed on the HBO program, apparently using his real name. According to their declarations opposing the motion to strike, four of the eight player-plaintiffs had been molested by Watson and four had not.

### 3.   Discussion

Plaintiffs filed suit against Time Warner for invasion of privacy, stated in four separate causes of action, and two additional causes of action for intentional and negligent infliction of emotional distress. Two issues are presented on appeal: first, does the anti-SLAPP statute apply here and, if so, have plaintiffs demonstrated a probability of success sufficient to withstand the motion to strike?

Throughout our analysis we are mindful of the following distinctions and considerations. First, plaintiffs themselves are of three different types: the four players who were Watson's victims, four players who escaped being molested, and two adult assistant coaches who also appeared in the team photograph. Second, two different publications are involved, the Sports Illustrated article and the television program. Depending on which category of plaintiff and which publication are involved, a different theory of liability may apply. Furthermore, while the anti-SLAPP statute is meant to be interpreted broadly,[2] its purpose is to curb meritless lawsuits, not to prohibit bona fide claims.[3] Although we recognize that the two coach-plaintiffs probably have a weaker case than the player-plaintiffs, the anti-SLAPP statute allows a motion to strike to be made against only a cause of action,

---

[2] Code of Civil Procedure section 425.16, subdivision (a).
[3] *Wilcox v. Superior Court, supra*, 27 Cal.App.4th at pages 816-817.

not a cause of action as it applies to an individual plaintiff.[4] For that reason, because we hold the cause of action for invasion of privacy is valid as to some plaintiffs, for purposes of the anti-SLAPP motion, we deem it sound as to all plaintiffs.

### a. *Code of Civil Procedure Section 425.16 Applies*

■ Our first determination is that Code of Civil Procedure section 425.16 applies in this case. As relevant to this case, section 425.16 provides:

"(a) The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly.

"(b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. [¶] . . . [¶]

"(e) As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: . . . (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."[5]

Both legislative mandate and judicial interpretation have expanded the application of the anti-SLAPP statute beyond its paradigmatic origins. At first, it was envisioned that the anti-SLAPP statute would be limited to situations involving "powerful and wealthy plaintiffs, such as developers,

---

[4]Code of Civil Procedure section 425.16, subdivision (b).
[5]Code of Civil Procedure section 425.16.

against impecunious protesters . . . ."[6] The state Legislature, however, has directed that Code of Civil Procedure section 425.16 be interpreted broadly.[7] Furthermore, a number of courts have approved the use of the anti-SLAPP statute by media defendants like those here.[8] Therefore, although in this situation, powerful corporate defendants are employing the anti-SLAPP statute against individuals of lesser strength and means, we are constrained by the authorities to permit its use against plaintiffs of this ilk.

Under the anti-SLAPP statute, a defendant has the initial burden of establishing a prima facie case that the subject act arose in furtherance of defendant's right of petition or free speech in connection with a public issue. This point is nearly conceded by plaintiffs. Freedom of the press and free speech rights are unquestionably implicated here. Although plaintiffs try to characterize the "public issue" involved as being limited to the narrow question of the identity of the molestation victims, that definition is too restrictive. The broad topic of the article and the program was not whether a particular child was molested but rather the general topic of child molestation in youth sports, an issue which, like domestic violence, is significant and of public interest.[9]

The Time Warner defendants, in publishing and broadcasting on the serious topic of child molestation, exercised orally and in writing their right of free speech concerning an issue of public interest in a public forum. Consonant with the mandate to give a broad interpretation to the anti-SLAPP statute, we agree with the trial court that Code of Civil Procedure section 425.16 applies.

### b. *Plaintiffs Have Shown a Reasonable Probability of Success*

We next decide whether plaintiffs have demonstrated a reasonable probability of success. Plaintiffs carry the burden of proof. On appeal, we conduct a de novo review to analyze whether plaintiffs have demonstrated sufficient facts to establish a prima facie case.[10] The standard used is like that for determining a motion for nonsuit, directed verdict, or summary

---

[6]*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 240 [83 Cal.Rptr.2d 677]; *Wilcox v. Superior Court, supra,* 27 Cal.App.4th at page 815.

[7]Code of Civil Procedure section 425.16, subdivision (a); *Sipple v. Foundation for Nat. Progress, supra,* 71 Cal.App.4th at page 236.

[8]*Sipple v. Foundation for Nat. Progress, supra,* 71 Cal.App.4th at page 240; *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1044 [61 Cal.Rptr.2d 58]; *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 863 [44 Cal.Rptr.2d 46].

[9]*Sipple v. Foundation for Nat. Progress, supra,* 71 Cal.App.4th at page 238.

[10]*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at page 824.

judgment.[11] ■ In the present case, we concur with the conclusion of the trial court that plaintiffs have shown a reasonable probability of success on their invasion of privacy claim on some grounds.

Plaintiffs' first four causes of action are all for invasion of privacy based on various theories of liability: misappropriation of identity, public disclosure of private facts, intrusion, and false light. Although plaintiffs have pleaded these various theories as separate causes of action, they are all based on identical facts, seek the same damages, and generally constitute an invasion of privacy claim. Furthermore, although each of the theories is treated separately by the parties in the motion to strike and the appellate briefs, we believe it is proper to treat them as one cause of action, expressing four different theories. If one theory is adequate, we will uphold denying the motion to strike as to plaintiffs' claims for invasion of privacy.[12]

■ We find support for this approach in Civil Code section 3425.3, providing: "*No person shall have more than one cause of action for damages for* libel or slander or *invasion of privacy or any other tort* founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions." (Italics added.)

In cases where essentially one harm has been alleged, the courts have interpreted the single-publication rule to mean that a plaintiff may have only one cause of action for one publication rather than multiple causes of action for torts such as defamation, invasion of privacy, personal injury, civil rights violations, or fraud and deceit.[13] In the present case, applying the statute means that each of the plaintiffs has a single cause of action for invasion of privacy based on each of the two publications. The tort of invasion of privacy may then be proved by four different theories.

■ Fundamentally, the right of privacy means the right to be left alone.[14] In *Gill v. Curtis Publishing Co.*, another case involving the unauthorized use of a photograph, the California Supreme Court upheld a claim for

---

[11]*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at page 824; *Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907 [84 Cal.Rptr.2d 303].

[12]But see *Shekhter v. Financial Indemnity Co.* (2001) 89 Cal.App.4th 141 [106 Cal.Rptr.2d 843].

[13]*Strick v. Superior Court* (1983) 143 Cal.App.3d 916, 922-925 [192 Cal.Rptr. 314].

[14]*Gill v. Curtis Publishing Co.* (1952) 38 Cal.2d 273, 276 [239 P.2d 630]; *Diaz v. Oakland Tribune, Inc.* (1983) 139 Cal.App.3d 118, 125 [188 Cal.Rptr. 762].

invasion of privacy. The famous French photographer Henri Cartier-Bresson had snapped a photograph of the plaintiffs, a husband and wife, without their consent as they "spooned" on counter stools in an ice cream shop. The magazine Ladies Home Journal then published the photograph to illustrate an article about love at first sight, described as the "wrong kind" of love based solely on sexual attraction. In their complaint, the plaintiffs alleged that the article portrayed them as immoral and dissolute persons. The court agreed, holding that "the public interest did not require the use of any particular person's likeness nor that of plaintiffs without their consent."[15]

■ The discussion in *Gill v. Curtis Publishing Co.* of the general common law right of privacy demonstrates that invasion of privacy may be actionable if materials such as an article about "bad" love or sexual molestation are juxtaposed with an illustrative photograph that makes a negative association between the subject matter and the subjects of the photograph.[16] That is precisely what occurred here.

In *Gill v. Hearst Publishing Co.*,[17] a subsequent case, the court held that Harper's Bazaar's reprint of the same photograph, published independently of the offending article, was not actionable. But the second *Gill* case does not apply here because that case concerned the photograph published without an offensive text accompanying it.

Therefore, we conclude that, in general, plaintiffs have a viable invasion of privacy claim. ■ More particularly, we review the tort for public disclosure. The elements of that tort are: " '(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern.' "[18] The latter factor relates to "newsworthiness" and is subject to a three-part test involving the social value of the published facts, the depth of intrusion into ostensibly private affairs, and whether the person acceded voluntarily to a position of public notoriety.[19]

■ The parties seem to agree that disclosure of information connecting a person with sexual molestation potentially may offend a reasonable person. But Time Warner argues that the photograph of plaintiffs was not private

[15]*Gill v. Curtis Publishing Co., supra*, 38 Cal.2d at page 279.

[16]*O'Hilderbrandt v. Columbia Broadcasting System, Inc.* (1974) 40 Cal.App.3d 323, 331 [114 Cal.Rptr. 826].

[17]*Gill v. Hearst Publishing Co.* (1953) 40 Cal.2d 224, 230-231 [253 P.2d 441].

[18]*Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 214 [74 Cal.Rptr.2d 843, 955 P.2d 469], quoting *Diaz v. Oakland Tribune, Inc., supra*, 139 Cal.App.3d 118, 126.

[19]*Diaz v. Oakland Tribune, Inc., supra*, 139 Cal.App.3d at page 132.

and its publication met the test of newsworthiness. Plaintiffs, of course, assert the photograph was private and was not newsworthy.

As to what constitutes a private fact, Time Warner asserts the information was not private because plaintiffs had played a public sport and the team photograph had been taken on a public baseball field. Furthermore, during the two years after Watson was found out, it had been widely reported that Watson had coached a Little League team, occasionally identified as the S_____ P_____, and that Watson had admitted molesting Little League players. Time Warner maintains that defendants' use of the team photographs disclosed only information that was already publicly known: ". . . Norman Watson, a convicted child molester, had coached the East Baseline S_____ P_____."

Plaintiffs counter that their identities, as coaches or players on Watson's team, were not revealed in any of the coverage of the Watson case until the publication of the team photograph, an event which publicly linked plaintiffs with child molestation as either victims, perpetrators, or collaborators. In opposition to the motion to strike, all the player-plaintiffs submitted declarations in which they stated that, immediately after the article and the program appeared, they were teased and harassed at school and called "gay," "faggot," "queer," and one of "Norm's boys." As a consequence, the players' academic performances suffered. Some of them were forced to quit school, to transfer, or to be home-schooled. The two coach-plaintiffs have stated they were "ridiculed, questioned, and harassed" and received crank phone calls accusing them of being molesters or of condoning molestation.

After reviewing the record, we do not perceive support for Time Warner's assertion that plaintiffs' membership on Watson's Little League team had been publicly known for two years. Time Warner apparently equates "private" with "secret" and urges any information not concealed has been made public. But the claim of a right of privacy is not " 'so much one of total secrecy as it is of the right to *define* one's circle of intimacy—to choose who shall see beneath the quotidian mask.' "[20] Information disclosed to a few people may remain private.[21]

In the present case, none of the previous media coverage specifically identified plaintiffs as team members. Nor, as the trial court observed, is there evidence in the record that the team photograph was ever widely

[20]*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 25 [26 Cal.Rptr.2d 834, 865 P.2d 633], quoting *Briscoe v. Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 534 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1].

[21]*Times-Mirror Co. v. Superior Court* (1988) 198 Cal.App.3d 1420, 1427 [244 Cal.Rptr. 556].

circulated. On this point, Time Warner asserted in its memorandum supporting the motion to strike that a Little League parent gave defendants the photograph. But plaintiffs maintain the photograph was intended to be private, only for dissemination among family and friends. Although plaintiffs do not know how Time Warner acquired the photograph, they never consented to its use. At this preliminary stage, the record supports plaintiffs' contention that their membership on Watson's Little League team was a private fact first publicly disclosed by Time Warner.

The cases relied upon by Time Warner are distinguishable. *Sipple v. Chronicle Publishing Co.*,[22] for example, was a summary judgment case in which the court held there was no triable issue about whether it was a private fact that a well-known and politically active man was homosexual. Unlike in *Sipple v. Chronicle,* the record here is not sufficiently developed to establish whether plaintiffs' membership on Watson's Little League team was a public fact as a matter of law. This case also differs from the recent United States Supreme Court case, *Bartnicki v. Vopper*,[23] in which the court reiterated the First Amendment affords protection for the publication of communications involving an issue of public concern. The other cases are distinguishable because they involve public records of criminal proceedings, other kinds of public litigation, and material obtained in the course of newsgathering activity.[24]

Additionally, relying on *Shulman v. Group W Productions, Inc.,* Time Warner argues plaintiffs cannot establish the use of the photograph was not newsworthy because the court is precluded from making editorial judgments about news content: "The courts do not, and constitutionally could not, sit as superior editors of the press."[25] But Time Warner selects only those parts of *Shulman* that serve its argument.

In *Shulman*, two plaintiffs, a mother and son, had sued the defendants for videotaping and broadcasting a documentary program showing the plaintiffs'

[22]*Sipple v. Chronicle Publishing Co.* (1984) 154 Cal.App.3d 1040, 1046-1047 [201 Cal.Rptr. 665].

[23]*Bartnicki v. Vopper* (2001) 531 U.S. 990 [121 S.Ct. 479, 148 L.Ed.2d 453].

[24]*Kapellas v. Kofman* (1969) 1 Cal.3d 20 [81 Cal.Rptr. 360, 459 P.2d 912]; *Cox Broadcasting Corp. v. Cohn* (1975) 420 U.S. 469 [95 S.Ct. 1029, 43 L.Ed.2d 328]; *Oklahoma Publishing Co. v. District Court* (1977) 430 U.S. 308 [97 S.Ct. 1045, 51 L.Ed.2d 355]; *Smith v. Daily Mail Publishing Co.* (1979) 443 U.S. 97 [99 S.Ct. 2667, 61 L.Ed.2d 399]; *The Florida Star v. B. J. F.* (1989) 491 U.S. 524 [109 S.Ct. 2603, 105 L.Ed.2d 443]; *Heath v. Playboy Enterprises, Inc.* (S.D.Fla. 1990) 732 F.Supp. 1145, 1148; *McNamara v. Freedom Newspapers, Inc.* (Tex. App. 1991) 802 S.W.2d 901, 905; *San Bernardino County Dept. of Public Social Services v. Superior Court* (1991) 232 Cal.App.3d 188 [283 Cal.Rptr. 332]; *KGTV Channel 10 v. Superior Court* (1994) 26 Cal.App.4th 1673 [32 Cal.Rptr.2d 181].

[25]*Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th at page 229.

rescue from an automobile accident and their transportation to the hospital in a medical helicopter. The California Supreme Court reviewed a summary judgment motion brought by the media defendants. Regarding the concept of newsworthiness, the *Shulman* court said the courts must accord great deference to editorial decisionmaking in matters involving legitimate public interest but that newsworthiness can be limited in the proper circumstances:

"An analysis measuring newsworthiness of facts about an otherwise private person involuntarily involved in an event of public interest by their relevance to a newsworthy subject matter incorporates considerable deference to reporters and editors, avoiding the likelihood of unconstitutional interference with the freedom of the press to report truthfully on matters of legitimate public interest. [Fn. omitted.] In general, it is not for a court or jury to say how a particular story is best covered. The constitutional privilege to publish truthful material 'ceases to operate only when an editor abuses his broad discretion to publish matters that are of legitimate public interest.' [Citation.] By confining our interference to extreme cases, the courts 'avoid[] unduly limiting . . . the exercise of effective editorial judgment.' [Citation.]"[26]

"On the other hand, no mode of analyzing newsworthiness can be applied mechanically or without consideration of its proper boundaries. To observe that the newsworthiness of private facts about a person involuntarily thrust into the public eye depends, in the ordinary case, on the existence of a logical nexus between the newsworthy event or activity and the facts revealed is not to deny that the balance of free press and privacy interests may require a different conclusion when the intrusiveness of the revelation is greatly disproportionate to its relevance. Intensely personal or intimate revelations might not, in a given case, be considered newsworthy, especially where they bear only slight relevance to a topic of legitimate public concern."[27]

Despite its caution against after-the-fact blue-penciling, the *Shulman* court went on to evaluate whether the material used in the program was editorially significant. The court determined that the subject matter of automobile accidents was of "legitimate public concern." It also concluded that the victim's "appearance and words as she was extricated from the overturned

---

[26]*Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th at pages 224-225.
[27]*Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th at page 226.

car, placed in the helicopter, and transported to the hospital were of legitimate public concern."[28] Furthermore, "[i]t is difficult to see how the subject broadcast could have been edited to avoid completely any possible identification without severely undercutting its legitimate descriptive and narrative impact."[29] The court further observed, although the mother's identity was possibly revealed by other details of the broadcast, it used neither her "full name nor direct display of her face."[30] The court held that summary judgment in favor of defendants was proper as to the cause of action for publication of private facts: "Lack of newsworthiness was held to be an essential element of a cause of action based on a claim that publication has given unwanted publicity to allegedly private aspects of a person's life."[31]

*Shulman* does not assist defendants here. The justification Time Warner offers for the newsworthiness of showing the faces of the Little League team members is "By showing visually that *any* child who plays sports could be placed in harm's way, the team photos underscore the warnings of the experts featured in the Article and Broadcast." Based on the record, "[t]his assertion rings hollow."[32] Instead, several reasons support the argument that a trier of fact could find the publication of plaintiffs' photographs showing their faces was not a legitimate public concern and not newsworthy.[33]

State law contains many statutes prohibiting the disclosure of the identity of both minors and victims of sex crimes.[34] Public policy favors such protection—as does the journalism profession. Plaintiffs supplied declarations from two journalism experts in which they confirm that use of the faces of the team members was not consonant with journalistic standards and practices. Plaintiffs also submitted examples of how the faces in the team photograph could have been obscured.

Furthermore, the article and the program in themselves demonstrate the team members' faces should have been concealed. Although the program showed footage of boys playing baseball, it did not show their faces but photographed them without their faces showing. In the program and the article, the victims were given pseudonyms unless they consented to using

---

[28]*Anti-Defamation League of B'nai B'rith v. Superior Court* (1998) 67 Cal.App.4th 1072, 1086 [79 Cal.Rptr.2d 597].

[29]*Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th at page 230.

[30]*Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th at page 230.

[31]*Anti-Defamation League of B'nai B'rith v. Superior Court, supra,* 67 Cal.App.4th at page 1086, discussing *Shulman.*

[32]*Diaz v. Oakland Tribune, Inc., supra,* 139 Cal.App.3d at page 135.

[33]*Times-Mirror Co. v. Superior Court, supra,* 198 Cal.App.3d at pages 1428-1429.

[34]Government Code sections 11131.5 and 54961; Penal Code sections 293, 293.5, and 868.7.

their real names. Nor is this case analogous to one in which a news documentary used the first name of a rape victim and a picture of her house.[35] The intrusion here, in which the children's faces were revealed, is far greater and outweighs the values of journalistic impact and credibility.[36]

At this preliminary stage in the proceedings, plaintiffs have presented a prima facie claim that the private fact of their membership on Watson's team was not newsworthy. Based on the theory of invasion of privacy for public disclosure of private facts, plaintiffs' cause of action is sufficient to overcome defendants' SLAPP motion.

On an additional theory, we also conclude that some of the plaintiffs may be able to prove a "false light" claim. The "false light" tort applies, if at all, to the players who were not molested and, secondarily, to the two assistant coaches. Plaintiffs contend the article and program falsely portrayed those players as molestation victims and the coaches as participating in or condoning the molestations. Time Warner protests that no reasonable person would have interpreted the article or the program in that way.

A "false light" claim, like libel, exposes a person to hatred, contempt, ridicule, or obloquy and assumes the audience will recognize it as such.[37] In the article and the program, defendants communicated the clear message that Watson had continuously molested the members of his Little League team until he was unmasked in September 1997. Although Watson's victims, except for one young man who volunteered to be interviewed for the program, cannot be identified specifically, the article and the program could reasonably be interpreted as reporting that some or all the players in the photograph had been molested by Watson.[38] Plaintiffs, therefore, have stated a "false light" claim. The requirement to show malice applies only to public figures, which plaintiffs are not.[39]

Having decided that plaintiffs' claim for invasion of privacy is viable on at least two grounds, we do not analyze the additional theories involving

[35]*Ross v. Midwest Communications, Inc.* (5th Cir. 1989) 870 F.2d 271.

[36]*Ross v. Midwest Communications, Inc., supra,* 870 F.2d at page 274.

[37]*Aisenson v. American Broadcasting Co.* (1990) 220 Cal.App.3d 146, 161 [269 Cal.Rptr. 379]; *Barnes-Hind, Inc. v. Superior Court* (1986) 181 Cal.App.3d 377, 387 [226 Cal.Rptr. 354].

[38]*Kapellas v. Kofman, supra,* 1 Cal.3d at page 33; *O'Hilderbrandt v. Columbia Broadcasting System, Inc., supra,* 40 Cal.App.3d at page 331; *James v. San Jose Mercury News, Inc.* (1993) 17 Cal.App.4th 1, 12 [20 Cal.Rptr.2d 890].

[39]*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1043 [232 Cal.Rptr. 542, 728 P.2d 1177].

invasion of privacy. For similar reasons, we decline to consider the validity of the emotional distress claims. We agree with Time Warner that these claims are probably cumulative and pleading them as separate torts may add nothing to plaintiffs' claim for invasion of privacy.[40] But a SLAPP motion is not the proper procedural vehicle to address these individual causes of action. Plaintiffs have shown the propriety of their invasion of privacy claim. Therefore, it cannot be said their lawsuit is meritless and "brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances."[41] Plaintiffs' emotional distress claims should survive the SLAPP motion.

## 4. *Disposition*

We affirm the lower court's denial of defendants' motion to strike plaintiffs' complaint. Plaintiffs shall recover their costs on appeal.

Ramirez, P. J., and Ward, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 12, 2001. George, C. J., and Brown, J., did not participate therein.

---

[40]Civil Code section 3425.3; *Grimes v. Carter* (1966) 241 Cal.App.2d 694, 702 [50 Cal.Rptr. 808, 19 A.L.R.3d 1310].

[41]Code of Civil Procedure section 425.16, subdivision (a).